PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

v.

HENRY GEOVANY HERNANDEZ-
VILLANUEVA,
             *Defendant-Appellant.*

No. 06-4211

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(8:05-cr-00379-DKC)

Argued: November 30, 2006

Decided: January 10, 2007

Before KING and SHEDD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge Hamilton wrote the
opinion, in which Judge King and Judge Shedd joined.

## COUNSEL

**ARGUED:** Clark U. Fleckinger, II, Rockville, Maryland, for Appel-
lant. Sandra Wilkinson, Assistant United States Attorney, OFFICE
OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for
Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney,
Baltimore, Maryland, for Appellee.

## OPINION

HAMILTON, Senior Circuit Judge:

Henry Geovany Hernandez-Villanueva (Villanueva) appeals the eighteen-month sentence imposed by the district court following his plea of guilty to the charge of unauthorized reentry into the United States, 8 U.S.C. § 1326(a). We affirm.

I

Villanueva, a native of El Salvador, was deported from the United States on April 17, 2004. Following his deportation, Villanueva illegally reentered the United States and was arrested at his mother's residence in Silver Spring, Maryland on May 31, 2005. At the time of his arrest, Villanueva was eighteen years old and was residing at his girlfriend's residence, along with the couple's infant daughter. According to Villanueva, he reentered the United States to live with and support his family.

Following his arrest, Villanueva was interviewed by law enforcement agents. Villanueva did not receive a *Miranda*\* warning prior to or during the interview. During the interview, Villanueva made statements concerning "La Mara Salvatrucha" or "MS-13," a violent gang that operates nationwide through numerous violent local street gangs. Villanueva also made statements concerning the violent activities of his local MS-13 gang, "Langley Park Salvatrucha" (MS-13 LPS), and other local MS-13 gangs operating in the Washington, D.C. metropolitan area. Villanueva offered to become a confidential informant in order to provide continuing intelligence on MS-13 activity in the Washington, D.C. metropolitan area. Following the interview, Bureau of Immigration and Customs Enforcement Agent Robert Neives prepared a summary of the interview.

On August 15, 2005, Villanueva was charged by a federal grand jury sitting in the District of Maryland with unauthorized reentry into the United States, 8 U.S.C. § 1326(a). On October 21, 2005, he pled guilty to the charged offense.

---

\**Miranda v. Arizona*, 384 U.S. 436 (1966).

In preparation for sentencing, a Presentence Report (PSR) was prepared. The PSR set Villanueva's offense level at 8, U.S. Sentencing Guidelines Manual (USSG) § 2L1.2(a). After determining that Villanueva's criminal history category was I and that he was entitled to a two level reduction for acceptance of responsibility, *id.* § 3E1.1(a), the PSR calculated Villanueva's sentencing range to be 0 to 6 months' imprisonment.

At sentencing, the government argued, consistent with its prehearing submission, that a sentence higher than that called for by the Sentencing Guidelines was warranted because Villanueva was, *inter alia*, a member of MS-13 LPS. In support of its argument, the government introduced the testimony of George Norris, a sergeant with the Prince George's County Police Department and an expert in the operations and affairs of MS-13 in the Washington, D.C. metropolitan area.

According to Sergeant Norris, MS-13 began in the 1980s in Los Angeles, California when numerous El Salvadorian immigrants banded together to form a gang to combat the hostilities leveled against them by Mexican street gangs. Over time, as the number of El Salvadorian immigrants in this country grew, so did the size of MS-13, as MS-13 formed local MS-13 gangs or "cliques" in other areas of the country, including several in the Washington, D.C. metropolitan area. In general, each local MS-13 gang holds regular meetings to discuss the business of the local gang and MS-13 in general, and each MS-13 member is required to pay dues to his local gang. Some of the money paid in dues is remitted to MS-13; other money is used by the local gang for a variety of legal and illegal activities. In a nutshell, like most other street gangs, the basic purpose of MS-13 and each of its local gangs is "to control the streets, to be the number one gang." This purpose is achieved "through intimidation, fear, and violence."

Based on his training and experience, Sergeant Norris opined that Villanueva was, at the time of his arrest in May 2005, still an active member of MS-13 LPS. He based this opinion on several factors. First, Sergeant Norris observed that, during the post-arrest interview, Villanueva provided detailed, current information concerning MS-13 gang activity in the Washington D.C. metropolitan area, including descriptions of recent violent criminal activity. Second, Sergeant Nor-

ris observed that Villanueva used the present tense when talking about his membership in MS-13 LPS and the activities of other members in his gang and other local MS-13 gangs. Third, Sergeant Norris pointed to Villanueva's desire to be a confidential informant for law enforcement. According to Sergeant Norris, to be a confidential informant, Villanueva had to be a member of a local MS-13 gang, because, given the violent and close-knit nature of a local MS-13 gang, nonmembers would not be in a position to provide meaningful intelligence. Fourth, Sergeant Norris testified that, about a week prior to Villanueva's arrest, he personally observed several MS-13 LPS members visit Villanueva at his (Villanueva's) girlfriend's residence. According to Sergeant Norris, if Villanueva was not an active member of MS-13 LPS, in the sense that he was not attending his local gang meetings and/or paying dues to MS-13 LPS, other members would kill him, which is the action taken against an individual that tries to leave MS-13.

Finally, Sergeant Norris relied on photographs taken of Villanueva both before his April 2004 deportation and after his arrest in May 2005. These photographs demonstrated that Villanueva acquired tattoos in the time frame between his deportation and his later arrest, several of which specifically related to MS-13. For example, Sergeant Norris explained that Villanueva had acquired on his abdomen a tattoo of an "M" and a "S." Sergeant Norris also referenced another recent MS-13 tattoo, which depicted a tombstone memorializing the death of MS-13 LPS member "Satancio," with the date February 2, 2005.

In response to the government's case at sentencing, Villanueva first objected to the government's use of the statements he made during the post-arrest interview. Next, Villanueva argued that a sentence above the advisory sentencing range was unwarranted because there was no evidence that he engaged in any criminal activity. Finally, he argued that it was impermissible for the government to seek a sentence above the advisory sentencing range merely because he chose to occasionally associate with members of MS-13 LPS.

In sentencing Villanueva, the district court first overruled Villanueva's *Miranda* objection to the court's consideration of the statements he made during the post-arrest interview. Next, in accordance with the PSR, the court found that Villanueva's sentencing range was

0 to 6 months' imprisonment. Then, the court turned to the factors set forth in 18 U.S.C. § 3553(a) to determine if a variance sentence was appropriate. In examining the nature and circumstances of Villanueva's offense under § 3553(a)(1), the court found that, although he came back "very soon after deportation primarily because of family" considerations, he continued to associate, after his reentry, with members of MS-13 LPS, "individuals that he knew were violent criminals." Regarding Villanueva's history and characteristics, the court noted that, although Villanueva is young and has a family,

> [o]n the other hand, he has exhibited by the tattoos and his association a continued lure of the MS-13 culture, which I find is violent and dangerous to himself as well as to others in the community. He has not yet developed or demonstrated a maturity, a backbone, a character to turn things around.

The court then examined the specific factors set forth in § 3553(a)(2) and concluded that a longer sentence than the sentencing range recommended by the Guidelines was warranted to promote respect for the law, deter further criminal conduct, and protect the public from further crimes committed by Villanueva (such as another illegal reentry). Finally, the court discussed its general concerns about Villanueva's gang activity:

> It may well be extraordinarily difficult to disassociate one's self from the MS-13 once one has been a member. This person standing before me has not . . . demonstrated any true desire to do that. I find that he has accumulated new tattoos since he was deported. He even acknowledged joining a clique in El Salvador . . . .
>
> He well understands the structure and had continued to participate in it. It was a gang that is terrorizing the community and [gang] activity cannot be countenanced. Whether he has personally participated in any violent activity is really not the only question. There is certainly no evidence that he directly has, but he is giving aid and comfort to those who do, and he risks violence to himself as well. It's simply not

a group to be associated with. It's dangerous for everyone involved.

After considering the advisory sentencing range and the § 3553(a) factors, the district court concluded that a variance sentence was warranted, and the court sentenced Villanueva to eighteen months' imprisonment, which was twelve months higher than the high end of Villanueva's sentencing range, but was six months below the statutory maximum sentence of twenty-four months' imprisonment. Villanueva noted a timely appeal.

II

Villanueva first challenges the district court's consideration of the statements he made during the post-arrest interview. These statements were admitted through the testimony of Sergeant Norris and through Agent Neives' summary of the interview.

A district court's ruling on the admissibility of evidence at sentencing is reviewed for an abuse of discretion. *United States v. Hopkins*, 310 F.3d 145, 154 (4th Cir. 2002). In applying this standard, we are mindful that the wide latitude on evidentiary matters enjoyed by trial courts is even greater for sentencing courts, because the Federal Rules of Evidence do not apply at sentencing. *Id.* Indeed, in resolving any dispute concerning a factor pertinent to the sentencing decision, "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a), p.s. Moreover, in selecting a particular sentence within the sentencing range (or deciding whether to depart or vary from that range), a court "may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." *Id.* § 1B1.4; *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

In this case, Villanueva argues that the district court's consideration of the statements he made during the post-arrest interview vio-

lated his *Miranda* rights. The district court admitted the statements, concluding that, even if the statements were obtained in violation of *Miranda*, the evidence was reliable, Villanueva's statements were voluntarily made, and there was no evidence of improper police conduct in eliciting the statements.

Unfortunately for Villanueva, his argument is foreclosed by our decision earlier this year in *United States v. Nichols*, 438 F.3d 437 (4th Cir. 2006). In that case, we held that a statement obtained in violation of *Miranda* is admissible at sentencing unless there is evidence that the statement was "actually coerced or otherwise involuntary." *Id.* at 444.

In our case, it is clear that Villanueva does not meet the weighty burden demanded by *Nichols*. In making his statements, Villanueva was attempting to avoid certain deportation. He spoke willingly and candidly in hopes of obtaining favorable treatment by the government. The circumstances surrounding the statements simply do not suggest that Villanueva was coerced into making the statements or that the statements were otherwise involuntary.

### III

Villanueva also argues that the eighteen-month sentence imposed by the district court is unreasonable. In imposing a sentence after *United States v. Booker*, 543 U.S. 220 (2005), a sentencing court must engage in a multi-step process. First, the court must correctly determine, after making appropriate findings of fact, the applicable sentencing range. *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Next, the court must "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). The court must articulate the reasons for the sentence imposed, particularly explaining any departure or variance from the sentencing range. *Hughes*, 401 F.3d at 546 & n.5. The explanation of a variance sentence must be tied to the factors set forth in § 3553(a) and must be accompanied by findings of fact as necessary. *Green*, 436 F.3d at 455-56.

We review the sentence imposed for reasonableness, considering "the extent to which the sentence . . . comports with the various, and sometimes competing, goals of § 3553(a)." *United States v. Moreland*, 437 F.3d 424, 433 (4th Cir. 2006). When we review a sentence outside the advisory sentencing range—whether as a product of a departure or a variance—we consider whether the sentencing court acted reasonably both with respect to its decision to impose such a sentence and with respect to the extent of the divergence from the sentencing range. *See id.* at 433-34 (variance sentence); *United States v. Hairston*, 96 F.3d 102, 106 (4th Cir. 1996) (departure sentence). If a court provides an inadequate statement of reasons or relies on improper factors in imposing a sentence outside the properly calculated advisory sentencing range, the sentence will be found unreasonable and vacated. *Green*, 436 F.3d at 457.

In this case, the district court considered the advisory sentencing range and considered the relevant statutory sentencing factors under § 3553(a). The court then concluded that the sentencing range under the Guidelines failed to account for the fact that Villanueva was a member of a violent local MS-13 gang and that Villanueva illegally reentered the United States and continued his association with this violent gang. The court also concluded that the sentencing range failed to sufficiently promote respect for the law, deter further criminal conduct, and protect the public from further crimes committed by Villanueva. We conclude that all of these considerations support the decision of the court to impose a sentence above the advisory sentencing range and that any associational rights enjoyed by Villanueva were not violated. *Cf. Dawson v. Delaware*, 503 U.S. 159, 165 (1992) ("[T]he Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment.").

We also conclude that the length of the sentence was reasonable. The advisory sentencing range under the Guidelines was a term of imprisonment of 0 to 6 months. The district court sentenced Villanueva to eighteen months' imprisonment. The court reasonably concluded that a variance sentence of an additional twelve months' imprisonment was necessary to account for the fact that Villanueva not only illegally reentered the United States but also continued his

association with a violent street gang after his reentry. Violence is a way of life for the members of local MS-13 gangs, and the court understandably sought to fashion a reasonable sentence to stymie Villanueva's ability to associate with any local MS-13 gang, with the hope that further removing him from the violent lures of a local MS-13 gang would increase his chances of turning his life around. Moreover, a longer sentence was appropriate to sufficiently promote Villanueva's respect for the law, deter further criminal conduct (*i.e.*, deter other deported MS-13 members from reentering the United States to continue in this country their association with the gang), and protect the public from further crimes committed by Villanueva (*e.g.*, protecting the public from another illegal reentry). In sum, although an eighteen-month sentence is three times the high end of the 0 to 6 months sentencing range, the sentence, which is only seventy-five percent of the two-year statutory maximum sentence, unquestionably serves the § 3553(a) factors. *Cf. United States v. Davenport*, 445 F.3d 366, 372 (4th Cir. 2006) (holding that a sentence more than three times the top of the advisory sentencing range was unreasonable where the factors relied upon by the district court did not justify such a sentence and the court failed to explain how the variance sentence served the § 3553(a) factors).

## IV

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED*