UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-4476

UNITED STATES OF AMERICA,

             Plaintiff – Appellant,

        v.

JERRY GASKILL,

             Defendant – Appellee.

Appeal from the United States District Court for the Eastern
District of North Carolina, at New Bern.  Terrence W. Boyle,
District Judge.  (2:06-cr-00003-BO)

Argued:  December 4, 2008          Decided:  March 20, 2009

Before KING and DUNCAN, Circuit Judges, and Rebecca Beach SMITH,
United States District Judge for the Eastern District of
Virginia, sitting by designation.

Vacated and remanded by unpublished per curiam opinion.

**ARGUED:** Banumathi Rangarajan, OFFICE OF THE UNITED STATES
ATTORNEY, Raleigh, North Carolina, for Appellant.  J. Matthew
Martin, MARTIN LAW FIRM, P.A., Asheville, North Carolina, for
Appellee.  **ON BRIEF:** George E. B. Holding, United States
Attorney, Anne M. Hayes, Assistant United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina,
for Appellant.  Thomas C. Manning, MANNING & CROUCH, Raleigh,
North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellee Jerry Gaskill was convicted and sentenced in the Eastern District of North Carolina for making materially false statements in connection with a matter within the jurisdiction of the Army Corps of Engineers, in violation of 18 U.S.C. § 1001.  At his sentencing hearing, the district court, over the Government's objection, granted Gaskill a downward variance from the advisory Sentencing Guidelines range of fifteen to twenty-one months, and imposed a sentence of three years' probation with six months' home confinement.  The Government has appealed Gaskill's sentence, asserting that the court erred in granting the downward variance.  As explained below, we agree with the Government, and thus vacate and remand.

I.

A.

On June 15, 2006, at the conclusion of a four-day trial, a jury in Raleigh convicted Gaskill of a single § 1001 offense.[1] That charge, contained in Count Four of a four-count indictment, specified that Gaskill had violated § 1001 by making (and aiding

___

[1] Pursuant to § 1001(a)(2) of Title 18, it is unlawful for any person to knowingly or willfully "make[] any materially false, fictitious, or fraudulent statement or representation" in connection with a matter "within the jurisdiction . . . of the Government of the United States."

and abetting others in making) false, fictitious, and fraudulent statements to the Army Corps of Engineers (the "Corps"), by submitting and causing to be submitted

> written statements which claimed that the creation of [a] 730 foot channel in the Currituck Sound, near Corolla, North Carolina, resulted by accident, when, in fact, he knew that the channel [had been] intentionally dredged, and dredged spoil intentionally discharged, through prop washing.

J.A. 20.[2]  When Gaskill committed this criminal offense, he was serving as the Director of the Ferry Division of the North Carolina Department of Transportation (the "NCDOT").  The trial evidence, viewed in the light most favorable to the prosecution, was essentially as spelled out below.

1.

In 2003, the NCDOT was directed by the North Carolina legislature to establish a ferry service from Currituck, an unincorporated community in Currituck County on the mainland of North Carolina, eastwardly across the Currituck Sound to Corolla, a small community in the same county on North Carolina's Outer Banks.  As Director of the NCDOT's Ferry Division, Gaskill was charged with establishing the ferry service by May 2004.  Together with officials of Currituck

---

[2] The indictment is found at J.A. 12-20.  Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

County — which owned the land essential to establishing the ferry service — Gaskill selected an area near the Whalehead Club in Corolla for the proposed ferry terminal. The part of the Currituck Sound lying adjacent to the Whalehead Club is known as the Whalehead Club Basin (the "Basin"). In order to establish a ferry service to the Corolla terminal, the Basin had to be dredged. Under applicable federal and state law, however, such dredging activity could be legally undertaken only after issuance of permits by the Corps and the North Carolina Division of Coastal Management (commonly referred to as "CAMA").[3]

Gaskill was familiar with the permitting processes of the Corps and CAMA, and wrote memoranda as early as 2002 to state and county officials specifying that the proper permits were essential to establishing the Corolla ferry terminal. As the land owner, Currituck County was responsible for obtaining such permits for the dredging of the Basin, but the county officials doubted whether the permits would be issued by the state and federal authorities because similar permits had been denied in the past.

---

[3] The North Carolina Division of Coastal Management is a state agency commonly referred to as "CAMA," a reference to the state's Coastal Area Management Act, which established the agency.

4

In February 2004, Bill Moore, who worked directly for Gaskill as Superintendent of Dredge and Field Maintenance for the Ferry Division, responded to Gaskill's question "How are we going to do this job?" by advising Gaskill that his people would "push a barge in there, build a dock, and push it back out." J.A. 137. In other words, Moore intended to move an NCDOT vessel into the shallow waters of the Basin in a forward manner in order to excavate the bottom of the waterway to create a channel. According to Moore, Gaskill "seemed okay" with this suggestion. Id. at 138. Gaskill thereafter told another Ferry Division employee, however, that "I didn't order those guys to do that dredging, but when Bill Moore made that statement, I knew [Moore] probably or could do something like that, and I didn't stop him, so that makes me partly responsible." Id. at 251.

As of May 2004, no permit applications for dredging in the Basin had been submitted by the County to either the Corps or CAMA. Accordingly, no permits had been issued by either agency. On May 6 and 7, 2004, Moore nevertheless directed Ferry Division employees to utilize the propellers of two NCDOT vessels to excavate a channel in the Basin for use by the ferry service. The Division employees then used the NCDOT vessels to "prop wash" a channel in the Basin that was about four to five feet in

5

depth, approximately 730 feet long by 30 feet wide, and included a turning basin approximately 110 feet long by 50 feet wide.[4]

Moore drove to Gaskill's office in Morehead City on May 7, 2004, after the dredging had been completed, and informed Gaskill that he had directed Ferry Division employees to "kick that channel out." J.A. 156. Neither Gaskill nor any other NCDOT personnel, however, informed the Corps or CAMA of those events. Nevertheless, the prop washing activity was almost immediately reported to the federal and state authorities by an anonymous third party. As a result, the Corps and CAMA initiated a joint federal-state investigation of the apparently illegal dredging activity. In responding to this investigation, Gaskill made the false statements that were used to secure his conviction for the § 1001 offense. These statements are explained further below.

First of all, the Corps and CAMA made inquiries to the Ferry Division concerning the dredging activities in the Basin. In formulating the Division's response to those inquiries, Gaskill, as the Division's Director, was instructed to conduct

---

[4] "Prop washing" is the term used in Count Four of the indictment to describe the dredging activity undertaken in the Basin on May 6 and 7, 2004. Generally, such dredging, also called "kicking" or "pushing," means "the use of the propellers of a vessel to create a backwash which, in turn, dredges and displaces material." J.A. 14.

an internal review of the dredging activity. Gaskill asked Moore and other Division personnel to prepare written statements detailing the events that took place in the Basin on May 6 and 7, 2004. According to Moore, he was directed by Gaskill to "get your story straight." J.A. 222. On June 23, 2004, Moore provided a letter to Gaskill, in which Moore falsely said that a state vessel had accidently run aground in the Basin, unintentionally disturbing the sediment on its bottom.

On June 25, 2004, after receiving Moore's letter, Gaskill submitted his proposed response to the NCDOT's Deputy Secretary (the "Response"). On July 2, 2004, that Response was forwarded, together with Moore's letter and other materials, to the Corps. The Response falsely characterized the disturbance in the Basin as unintentional and as having a limited environmental impact. See J.A. 628 (representing to the Corps that "neither Mr. Moore or the Ferry Division had any intention of deepening the channel, and any disturbance was unintentional"). The Corps, upon receiving NCDOT's submission, which included the Response, continued to investigate the prop washing incident, seeking to identify and possibly prosecute those responsible.

On June 28, 2004, CAMA investigators issued a Notice of Violation to the NCDOT, alleging that "[i]t appears NCDOT is responsible for the unauthorized excavation of a channel" within the Basin. J.A. 402. That same day, in a telephone interview

7

with a CAMA investigator, Gaskill again falsely asserted that the NCDOT had not intentionally caused an environmental disturbance within the Basin. On July 6, 2004, Gaskill responded in writing to CAMA's Notice of Violation, sending it a letter — substantially identical to the Response submitted to the Corps — again falsely maintaining that the prop washing activity in the Basin was unintentional.

Eventually, by notice to the Corps of August 23, 2004, the NCDOT reversed its position concerning the prop washing incident, and accepted full responsibility for the illegal dredging activities in the Basin on May 6 and 7, 2004. J.A. 366 (specifying that "[the NCDOT] has investigated the activities of the Ferry Division and has determined that they were responsible for the unauthorized disturbance"). Because the Corps does not perform restorative environmental work — relying instead on the responsible party — the four-month delay in identifying the responsible party resulted in a substantial amount of additional environmental harm in the Currituck Sound that otherwise could have been mitigated or avoided.

2.

Gaskill testified in his own defense at trial, asserting that when the NCDOT submitted his Response to the Corps on July 2, 2004, he was unaware of the actual facts relating to the Ferry Division's prop washing activities in the Basin. He also

8

said that he was unaware of those facts when the separate exculpatory submission was made to CAMA on July 6, 2004. In fact, Gaskill told the jury that he did not learn of the intentional nature of those activities until mid-July 2004, after his denials had been submitted to the Corps and CAMA. Gaskill denied providing any false information concerning the incident to the Corps or CAMA, and asserted that he had contacted them immediately upon learning of the prop washing activity.

On cross-examination, however, the prosecution confronted Gaskill with evidence contradicting his direct testimony, including his admission to a federal investigator on August 26, 2004, that Moore "came clean" with him on June 25, 2004, concerning the intentional prop washing in the Basin. In view of these multiple contradictions, and on the basis of the other evidence,[5] the jury rejected Gaskill's exculpatory version of the

---

[5] At trial, the Government presented extensive evidence showing that Gaskill was aware, prior to responding to the Corps and CAMA, of the illegal nature of the dredging activities in the Basin. Moore testified that he told Gaskill of the illegal nature of the dredging on May 7, 2004. Gaskill's former secretary testified that, at a May 11, 2004 meeting, Gaskill stated that the Ferry Division had "made water" in Corolla. Additionally, Charles Utz, another Division employee, testified that sometime before the end of June 2004, Gaskill showed him the CAMA Notice of Violation and an aerial photograph of the prop washed area. This evidence convinced Utz that the dredging could not have been an accident, but Gaskill nevertheless had him prepare the July 6, 2004 letter to CAMA, asserting Gaskill's
(Continued)

prop washing incident.  Gaskill was thus convicted of the § 1001 offense in Count Four of the indictment.[6]

## B.

After Gaskill's trial and conviction, a presentence report (the "PSR") was prepared, and it recommended a Sentencing Guidelines base offense level of 14.  See USSG § 2J1.2 (2006). The PSR also recommended a two-level enhancement for obstruction of justice, predicated on Gaskill's perjured trial testimony. See id. § 3C1.1.  As stated in the PSR, the final offense level of 16, combined with a criminal history category of I, yielded an advisory sentencing range of twenty-one to twenty-seven months of imprisonment.

In response to the PSR, Gaskill objected to an obstruction of justice enhancement.  He also filed a "Motion for Variance Sentence," asserting that a sentence below the advisory Guidelines range was appropriate.  In the motion, Gaskill alleged that he had neither sanctioned, participated in, nor authorized the dredging; that he had been "betrayed" by his

---

exculpatory version of the facts.  In all, eighteen witnesses testified for the Government.  Gaskill himself, plus six character witnesses, testified for the defense.

[6] At trial, the court granted judgment of acquittal on two related counts against Gaskill, and the jury acquitted him of the remaining charge.

subordinate, Moore; and that his criminal conduct — lying about the dredging — was out of character and a singular lapse of judgment, i.e., aberrant behavior. In its written sentencing memorandum, the Government objected to Gaskill's variance request, asserted that an adjustment for obstruction of justice was appropriate, and requested the imposition of a sentence within the advisory Guidelines range.

On March 20, 2007, the district court conducted the sentencing hearing.[7] The court first sustained Gaskill's objection to the PSR's recommendation of a two-level enhancement for obstruction of justice, concluding that the prosecution had "not satisfied by a preponderance of the evidence that there was an obstruction of justice." J.A. 753.[8] The court then determined that Gaskill's proper advisory sentencing range, predicated on a base offense level of 14 and a criminal history category of I, was fifteen to twenty-one months.

The district court then turned to Gaskill's request for a variance sentence, granting a downward variance and sentencing him to three years' probation with six months' home confinement.

---

[7] The transcript of the Sentencing Hearing is found at J.A. 734-68.

[8] On appeal, the Government does not contend that the sentencing court erred in rejecting the obstruction of justice enhancement.

11

The court also ordered Gaskill to perform 150 hours of community service and pay a $5000 fine. The Statement of Reasons filed by the court with respect to the sentence did not explain the basis for the variance sentence, nor did it select or emphasize any of the 18 U.S.C. § 3553(a) factors as justifying such a variance. Instead, the Statement of Reasons provided that "[t]he defendant's motion for variance is granted by the court." J.A. 798.

The Government has timely noted this appeal, challenging the sentence and seeking to have it vacated. We possess jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.[9]

II.

We review a sentence imposed by a district court for reasonableness, applying an abuse of discretion standard. See Gall v. United States, 128 S. Ct. 586, 597-98 (2007); United States v. Pauley, 511 F.3d 468, 473-74 (4th Cir. 2007).[10]

---

[9] Upon motion of the Government, the execution of Gaskill's sentence has been stayed pending resolution of this appeal.

[10] Gaskill contends that his sentence can only be vacated if it constitutes plain error, because the Government waived any objection by failing to object following the imposition of the variance sentence. This contention is without merit. As we have previously recognized, the Government preserves its objection to a variance sentence by "arguing for a sentence within the Guidelines range throughout the sentencing hearing." United States v. Curry, 461 F.3d 452, 459 (4th Cir. 2006); see (Continued)

12

Generally, in order to determine whether a sentencing court has abused its discretion, we apply a two-step analysis. Pauley, 511 F.3d at 473. First, we examine the sentence for "significant procedural errors," and, second, we evaluate the substance of the sentence. Id. In assessing procedural reasonableness, we examine whether the sentencing court properly calculated the Guidelines range, whether it treated the Guidelines as mandatory, whether it considered the factors set forth in 18 U.S.C. § 3553(a), and whether it selected a sentence based on "clearly erroneous facts" or failed to sufficiently explain the sentence. See Gall, 128 S. Ct. at 597; Pauley, 511 F.3d at 473.

If there are no procedural errors, we proceed to consider the substantive reasonableness of a sentence, "taking into account the 'totality of the circumstances including the extent of any variance from the Guidelines range.'" Pauley, 511 F.3d at 473 (quoting Gall, 128 S. Ct. at 597). In evaluating a sentence that falls within a properly calculated Guidelines range, we may — but are not obliged to — apply a presumption of reasonableness. Gall, 128 S. Ct. at 597. Where, as here, the

---

also United States v. Clark, 434 F.3d 684, 686 n.1 (4th Cir. 2006). The Government, in its sentencing memorandum and at the sentencing hearing, advocated for a sentence within the advisory Guidelines range.

13

sentence falls outside the advisory Guidelines range, we "may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Id.

## III.

The sentence imposed on Gaskill is flawed in that the sentencing court procedurally erred by failing to fully consider the 18 U.S.C. § 3553(a) factors and adequately explain the sentence imposed, as required by § 3553(c). We explain further below.

## A.

The Supreme Court's decision in Gall v. United States identified two potential procedural problems with respect to a sentencing court's assessment of the relevant sentencing factors. See 128 S. Ct. 468, 596-97 (2007). First, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate," a sentencing court should "consider all of the § 3553 factors to determine whether they support the sentence requested by a party." Id. at 596. Significantly, § 3553(a) mandates that a sentencing court consider the statute's enumerated factors. See § 3553(a) ("The court, in determining the particular sentence to be imposed, shall consider [the § 3553(a) factors]."); see also United

14

States v. Battle, 499 F.3d 315, 323 (4th Cir. 2007) ("A district court must . . . consider the § 3553(a) factors in every case, regardless of whether the sentence imposed is within the Guidelines range.").[11] Nevertheless, a sentencing court need not accord equal weight to each of the § 3553(a) factors, and it is "quite reasonable for the sentencing court to have attached great weight to a single factor." United States v. Pauley, 511 F.3d 468, 476 (4th Cir. 2007) (internal quotation marks omitted).

Second, after determining the appropriate sentence, a sentencing court "must adequately explain the chosen sentence to

[11] Pursuant to § 3553(a) of Title 18, a sentencing court, in determining the sentence to impose, shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, (B) afford adequate deterrence to criminal conduct, (C) protect the public from further crimes, and (D) provide the defendant with needed medical care or other correctional treatment;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established in the applicable guidelines;
>
> (5) any pertinent policy statements; and
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

allow for meaningful appellate review and to promote the perception of fair sentencing." Gall, 128 S.Ct. at 597; see also 18 U.S.C. § 3553(c) (directing sentencing court to "state in open court the reasons for its imposition of the particular sentence"). As we have explained, however, a sentencing court need not "robotically tick through § 3553(a)'s every subsection," United States v. Johnson, 445 F.3d 339, 345 (4th Cir. 2006), and we have ourselves matched a sentencing court's reasons — when not couched in the precise language of § 3553(a) — to an appropriate § 3553(a) factor, United States v. Moulden, 478 F.3d 652, 658 (4th Cir. 2007). Significantly, a sentencing court's "explanation of a variance sentence must be tied to the factors set forth in § 3553(a)." United States v. Hernandez-Villanueva, 473 F.3d 118, 122-23 (4th Cir. 2007). Moreover, notwithstanding our deferential standard for review, it is well established that a sentence well outside the advisory Guidelines range "should be supported by a more significant justification than a minor one." Gall, 128 S. Ct. at 597.

## B.

At Gaskill's sentencing, the district court did not explicitly state that it had considered any of the § 3553(a) factors. Significantly, the court did not address the Government's § 3553(a) contentions on the nature of the offense, the characteristics of the defendant, or the importance of

16

affording adequate deterrence to criminal conduct. Additionally, the court failed to assess Gaskill's contentions — presented in his variance motion — that he had neither sanctioned, participated in, nor authorized the dredging; that he had been "betrayed" by Moore; and that his criminal conduct constituted aberrant behavior.

The sentencing court observed that, although both Gaskill and the Government had made arguments concerning the appropriate sentence, other factors would also be considered. See J.A. 764 ("I'm going to give both defendants a sentence in a minute, but as the referee, I think it would be unjust for the sentence to be grounded only in what the two sides say, because I think that grossly distorts what's going on in this case."). In order to determine whether the court considered the § 3553(a) factors, we assess the other factors discussed by the court, placing them into two broad categories: the "dredging comments" and the "public service comment."

1.

In its dredging comments, the court stated that it was "committed to restoring and preserving . . . the environment" in coastal North Carolina, but that "the whole mosaic of the environment" should be considered. J.A. 764. The court noted that, in assessing the impact to this "delicate and precious resource," consideration should be given to the roles of "the

17

national government, the United States, and the state of North Carolina." Id. at 763. The court highlighted the fact that Gaskill did not simply "on a Saturday afternoon, decide[] to go out, [and] on a lark do something that impacted the environment." Id. Rather, "[t]his was the state of North Carolina, through all its agencies and resources, doing this as official policy." Id. Further, the court observed that the ferry services provided by North Carolina are "critical, essential, life-saving and life-preserving and life-generating lines between coastal areas, islands, and the people who live there." Id.[12]

---

[12] As an example of the existing situation in coastal North Carolina, the district court discussed at some length the relationship of the state and federal governments and their response after Hurricane Isabelle:

> In Hurricane Isabelle, an inlet was punched through on Hatteras Island. Did they call it an inlet? No. Why didn't they call it an inlet? They didn't call it an inlet because you can't close an inlet, but you can close a breach. So the government, state and federal, went hog wild, hard as they could, long as they could, dredging and pumping. Was that an environmentally positive or sound event? I don't know. . . . Was there a political and policy commitment to keep a land road to Hatteras? You bet there was. Did that mean that that inlet was going to be closed? If in any way it was physically possible, that inlet was going to be closed, and there was no limit to what was going to happen until that happened.

J.A. at 764-65.

18

Thus, although the sentencing court recognized that environmental damage to the Basin was "unfortunate and reprehensible," it tempered that observation by stating that such damage "needs to be seen in the context of everything that's going on in coastal North Carolina." J.A. 765. The court then stated that "[t]he state necessarily and properly remediated the damage. Was there a long-term permanent effect? Yes, I think so, based on what I've read. Is that unfortunate? Yes. Is there anything more that can be done? Probably nature needs to take its course." Id. at 765-66.

The dredging comments thus only address the nature and circumstances of the prop washing incident in the Basin. They do not reach or address the nature and circumstances of Gaskill's § 1001 false statements offense, and cannot be characterized as addressing any specific § 3553(a) factor. As a result, the dredging comments are not linked to the history and characteristics of Gaskill personally, to the nature and circumstances of his § 1001 offense, or to any other factor specified in § 3553(a).

2.

Turning to the public service comment, the sentencing court recognized that Gaskill had served in a supervisory capacity for the state and had a long history of public service. The court observed that Gaskill had "provided extensive public service in

19

his job as director of the ferry service" and that he had served in a management capacity as a state employee with significant responsibilities. J.A. 766. This comment appears to bear on the factor identified in § 3553(a)(1), "the nature and circumstances of the offense and the history and characteristics of the defendant." See Hernandez-Villanueva, 473 F.3d at 122 (explaining that sentencing court "'may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law'" (quoting USSG § 1B1.4)). Accordingly, the public service comment indicates that the court partially considered one aspect — the history and characteristics of the defendant — of one factor under § 3553(a).

C.

In the absence of some indication that the sentencing court considered all the § 3553(a) factors, we are unable to conclude that it complied with its § 3553 mandate. See United States v. Montes-Pineda, 445 F.3d 375, 380 (4th Cir. 2006) (explaining that "district court's explanation should provide some indication . . . that the court considered the § 3553(a) factors"). First, the court did not explicitly state that it had considered the § 3553(a) factors or address the parties' arguments addressing such factors. Second, in these circumstances, we accept the proposition that the sentencing

20

court primarily considered the factors it placed on the record at the sentencing hearing — i.e., the dredging comments and the public service comment — in granting a downward variance. The court's implicit consideration of only a part of a single § 3553(a) factor, however, is insufficient to support the implication that it considered each of the § 3553(a) factors.[13] Finally, the Statement of Reasons filed in connection with the sentencing did not explain the court's reasoning. In fact, the court did not identify <u>any</u> § 3553(a) factor in its Statement of Reasons as being supportive of a variance sentence. Because a sentencing court should provide a more substantial justification for a probationary sentence when the Advisory Guidelines call for an active sentence of imprisonment, such as in this case, we are unable to conclude that the award of a downward variance was procedurally sound.[14]

---

[13] Gaskill contends that the sentencing court incorporated the arguments that were made in his motion for a variance when the court stated that it was "going to allow the defendant's motion for a variant sentence on Mr. Gaskill." <u>See</u> J.A. 766. The record reveals that, although the court granted Gaskill's motion, it did so without referring to Gaskill's asserted reasons in any way. We are, in these circumstances, unable to impute the contentions of the motion to the court's reasoning.

[14] On appeal, the Government has characterized the sentencing court's reliance on factors not cognizable under § 3553(a) as constituting procedural error. Br. of Appellant 27-30. So long as a sentencing court satisfies the procedural requirements delineated by the Supreme Court, however, a challenge to its reliance on improper factors is more
(Continued)

IV.

Pursuant to the foregoing, we vacate and remand for resentencing.

VACATED AND REMANDED

---

appropriately considered under a substantive reasonableness analysis. See United States v. Moreland, 437 F.3d 424, 434 (4th Cir. 2006) (instructing that "[a] sentence may be substantively unreasonable if the court relies on an improper factor"); see also United States v. Green, 436 F.3d 449, 456-57 (4th Cir. 2006) (recognizing that a "district court's reasons for not applying the properly calculated Guideline range must be based on the factors listed in § 3553(a)"). Having concluded that the court erred procedurally, we need not reach or assess the substantive reasonableness of the sentence.