*Oscar Cruz-Quintanilla v. State of Maryland*, No. 44, September Term, 2016.  Opinion by Barbera, C.J.

**CRIMINAL LAW — SENTENCING DETERMINATION — EVIDENCE —** Trial court did not abuse its discretion by permitting testimony at the sentencing hearing regarding defendant's gang membership, where, unlike in *Dawson v. Delaware*, 503 U.S. 159 (1992), the evidence established that all MS-13 members are aware of, and required to participate in, the criminal acts of violence of the gang.

Circuit Court for Prince George's County
Case No. CT131649B
Argued: February 3, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 44

September Term, 2016

_____

OSCAR CRUZ-QUINTANILLA

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Barbera, C.J.

_____

Filed: July 31, 2017

We consider in this case whether evidence of a convicted defendant's membership in a gang is admissible at sentencing, where the gang membership is unrelated to the underlying criminal conviction but the evidence establishes that all gang members are aware of, and required to participate in, the criminal acts of violence of the gang. For the reasons that follow, we answer that question in the affirmative.

I

*The trial, sentencing, and appeal*

Petitioner Oscar Cruz-Quintanilla was indicted in the Circuit Court for Prince George's County on numerous charges in connection with the robbery of the home of Adolfo Sical-Rosales and his wife, Rosa Murillo-Aguilar, on July 26, 2013. Following a jury trial, he was convicted of reckless endangerment; wearing, carrying, or transporting a handgun; and conspiracy to commit robbery with a dangerous weapon. For purposes of this opinion, there is no need to summarize all of what occurred at trial. Relevant to this appeal is what occurred at sentencing.

At sentencing, the State sought to introduce for the first time evidence that Cruz-Quintanilla was a member of the gang known as MS-13. Over defense counsel's objections, the court permitted Sergeant George Norris of the Prince George's County Police Department to testify regarding Cruz-Quintanilla's MS-13 membership.

Sergeant Norris testified that various tattoos on Cruz-Quintanilla's body, shown in photographs admitted into evidence, indicate that he is a member of MS-13. According to police records of the Sergeant's encounters with MS-13 members and Cruz-Quintanilla specifically, Cruz-Quintanilla has been a documented MS-13 member since at least 2004.

Sergeant Norris further testified that "[o]ne of the common mottos" for MS-13 is "mata, m-a-t-a, vola, v-o-l-a, controla, c-o-n-t-r-o-l-a, which is kill, rape, and control." Any MS-13 member would "have to know that MS-13 engages in violence because the mere initiation of MS-13 involves violence. It involves you getting beaten by your own MS-13 member friends." Sergeant Norris stated that "there are several actions that you have to take prior to being jumped in [i.e., initiated], which is putting in work for the gang or committing crimes for the gang to show that you are loyal to the gang and show that they can trust you, that you're going to support the gang." Sergeant Norris added that one cannot be a member of MS-13 and decline to participate in violence. Any MS-13 member who declines to participate in the gang's criminal acts of violence is subject to discipline by other gang members.

The State argued for the imposition of a total sentence of 26 years. The State based its recommendation on the evidence of Cruz-Quintanilla's MS-13 gang membership since 2004, the nature of the crimes of which he was convicted, and his prior record.[1] The court, noting that it had considered "[a]ll of the evidence" in the case, sentenced Cruz-Quintanilla to terms of three years of imprisonment on the weapon and reckless endangerment convictions, to be served concurrently. For the conspiracy to commit armed robbery conviction, the court sentenced Cruz-Quintanilla to 20 years of imprisonment, with all but

---

[1] The State noted that Cruz-Quintanilla's prior record included a probation before judgment in 2006, a conviction for burglary in the fourth degree and harassment in 2006, and a "guilty" for driving without a commercial driver's license in 2011.

nine years suspended, to run consecutive to the two other sentences. Upon Cruz-Quintanilla's release, he must serve a period of probation of five years.[2]

On appeal, Cruz-Quintanilla asserted, among other arguments, that the circuit court erred in admitting evidence of his gang membership at sentencing. The Court of Special Appeals affirmed the judgment of the circuit court. *Cruz-Quintanilla v. State*, 228 Md. App. 64, 71-72 (2016). Emphasizing "'that a sentencing court is vested with virtually boundless discretion' in imposing a sentence," the intermediate appellate court concluded that "it was properly within the discretion of the sentencing court to consider evidence regarding the nature and activities of MS-13 as it pertained to the court's consideration of [Cruz-Quintanilla's] character." *Id.* at 68, 70 (citation omitted). The Court of Special Appeals recognized that, although in some instances admission of evidence regarding beliefs or memberships protected by the First Amendment is prohibited during sentencing, "that evidence may be admissible in appropriate cases in which evidence of criminal or violent conduct of the gang is introduced." *Id.* at 69 (citing *Dawson v. Delaware*, 503 U.S. 159, 165-66 (1992)). Because Sergeant Norris's testimony established that Cruz-Quintanilla endorsed not only the beliefs of MS-13, but also its criminal activities, that evidence was properly admitted. *Id.*

We granted Cruz-Quintanilla's petition for writ of certiorari to answer "[w]hether trial courts may admit gang membership evidence in a sentencing hearing when the gang

---

[2] The court included among the probation conditions that Cruz-Quintanilla "not be involved in any gang activity or be a member of any gang." He does not contest that condition on appeal.

3

membership is unrelated to the convictions and the defendant is not connected to any criminal offenses on behalf of the gang." *Cruz-Quintanilla v. State*, 450 Md. 101 (2016). As noted at the outset of this opinion, the answer to that question is "yes."

II

*Discussion*

*A trial judge's discretion during sentencing proceedings*

This Court has long adhered to the general principle that the "sentencing judge is vested with virtually boundless discretion" in devising an appropriate sentence. *Smith v. State*, 308 Md. 162, 166 (1986) (citation omitted); *see also Abdul-Maleek v. State*, 426 Md. 59, 71 (2012); *Jones v. State*, 414 Md. 686, 693 (2010); *Jennings v. State*, 339 Md. 675, 683 (1995). The sentencing judge is afforded such discretion "to best accomplish the objectives of sentencing—punishment, deterrence and rehabilitation." *Smith*, 308 Md. at 166. To achieve those objectives, the sentencing judge is not constrained simply to "the narrow issue of guilt." *Id*. at 167 (citation omitted). Rather, "[h]ighly relevant—if not essential—to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.* (citation omitted). So it is that, in exercising that discretion, the sentencing judge may take into account the defendant's "reputation, prior offenses, health, habits, mental and moral propensities, and social background." *Jackson v. State*, 364 Md. 192, 199 (2001) (citation omitted). "The consideration of a wide variety of information about a specific defendant permits the sentencing judge to individualize the sentence to fit 'the offender and not merely the crime.'" *Smith*, 308 Md. at 167 (quoting *Williams v. New York*, 337 U.S. 241,

4

247 (1949)). Given the broad discretion accorded the sentencing judge, "generally, this Court reviews for abuse of discretion a trial court's decision as to a defendant's sentence." *Sharp v. State*, 446 Md. 669, 685 (2016).

The sentencing judge's discretion, although broad, is not without its limits. A given sentence is subject to review on any of three potential grounds: "(1) whether the sentence constitutes cruel and unusual punishment or violates other constitutional requirements; (2) whether the sentencing judge was motivated by ill-will, prejudice or other impermissible considerations; and (3) whether the sentence is within statutory limits." *Jackson*, 364 Md. at 200 (internal emphasis omitted) (quoting *Gary v. State*, 341 Md. 513, 516 (1996)). Cruz-Quintanilla's challenge to his sentence is based on the first of these grounds, as he argues that the sentence violates the First Amendment to the United States Constitution because it is based in part on the gang-related evidence.

*Sentencing and the Constitution*

The First Amendment to the Constitution, applicable to the states through the Fourteenth Amendment, *Schneider v. State*, 308 U.S. 147, 160 (1939), provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Freedom of association is implicitly guaranteed by the First Amendment. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). The Supreme Court explained:

> Our decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human

5

relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

*Id.* at 617-18.

"[T]he nature and degree of constitutional protection afforded freedom of association may vary depending on the extent to which one or the other aspect of the constitutionally protected liberty is at stake in a given case." *Id.* at 618. Indeed, despite First Amendment protection afforded to beliefs, memberships, and other affiliations, such protection is by no means absolute. For instance, "freedom of association may be restricted if reasonably necessary to accomplish the essential needs of the state and public order." *Malone v. United States*, 502 F.2d 554, 556 (9th Cir. 1974).

Pertinent to our discussion here, the Supreme Court has addressed the bounds of First Amendment protections at the sentencing phase of a criminal prosecution. In *Barclay v. Florida*, 463 U.S. 939, 949 (1983) (plurality opinion), the plurality concluded that the "United States Constitution does not prohibit a trial judge from taking into account the elements of racial hatred in this murder" during sentencing, where the defendant's "desire to start a race war [was] relevant to several statutory aggravating factors." *See also Wisconsin v. Mitchell*, 508 U.S. 476, 479 (1993) (considering the constitutionality of a state statute enhancing the maximum penalty for an offense if the defendant intentionally selects a victim based on the victim's race).

6

The Supreme Court also addressed First Amendment sentencing implications in *Dawson*, 503 U.S. at 159, a decision that plays a central role in both parties' arguments in the present case. The sentencing evidence at issue in *Dawson*, much like the evidence in this case, addressed the defendant's membership in an organized gang. Also like the evidence offered at sentencing in the present case, the gang-related evidence offered by the prosecution at sentencing did not relate to the crime of which Dawson was convicted. But, as we shall see, the similarities in *Dawson* and the case before us essentially end there.

Dawson *and its progeny*

Dawson was charged and convicted of first degree murder and related crimes committed during his escape from prison, and the State sought the death penalty. *Id.* at 160-61. Before the sentencing proceeding, the parties agreed to a stipulation pertaining to Dawson's membership in the Aryan Brotherhood. The stipulation was limited to the following:

> The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware.

*Id.* at 162. The stipulation was read to the jury together with evidence of Dawson's tattoo of the words "Aryan Brotherhood" on his hand and evidence that Dawson used the name "Abaddon," and had a tattoo of the name "Abaddon" on his stomach. *Id.* at 161-62. Abaddon means "one of Satan's disciples." *Id.* at 161. Although Dawson agreed to the admission of the stipulation into evidence, he continued to assert that the admission violated the First and Fourteenth Amendments to the Constitution. *Id.* at 162. The jury

7

elected to have Dawson sentenced to death. *Id.* at 163. The Supreme Court of Delaware affirmed the convictions and the death sentence. That court held that the evidence related to the Aryan Brotherhood did not violate Dawson's constitutional rights because the stipulation pertained to Dawson's character, and not his race, religion, or political affiliation. *Id.*

The United States Supreme Court granted certiorari and reversed the judgment of the state supreme court. *Id.* Dawson argued before the Supreme Court that the Constitution prohibits during sentencing the admission of evidence concerning any beliefs or activities protected under the First Amendment. *Id.* at 164. The Court noted at the outset of its discussion that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Id.* at 165. This pronouncement was consistent with the Court's decision, eight years earlier, in *United States v. Abel*, 469 U.S. 45 (1984). The *Dawson* Court noted in its holding in *Abel* that the Government could impeach a witness for the defense with evidence that the witness and the defendant were members of the Aryan Brotherhood and that the members were required to lie on behalf of one another. *Dawson*, 503 U.S. at 164. The Court added: "Though *Abel* did not involve a . . . sentencing proceeding, its logic is perfectly applicable to such a proceeding." *Dawson*, 503 U.S. at 165.

The Supreme Court ultimately determined that the stipulation should not have been admitted in Dawson's case because "the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts,"

8

and therefore the "narrowness of the stipulation left the Aryan Brotherhood evidence totally without relevance to Dawson's sentencing proceeding." *Id.* at 165-66. Instead, the stipulation focused solely on Dawson's abstract beliefs. *Id.* Important to the present case, the *Dawson* Court observed:

> Before the penalty hearing, the prosecution claimed that its expert witness would show that the Aryan Brotherhood is a white racist prison gang that is associated with drugs and violent escape attempts at prisons, and that advocates the murder of fellow inmates. *If credible and otherwise admissible evidence to that effect had been presented, we would have a much different case.*

*Id.* at 165 (emphasis added). "Because Delaware failed to do more" than offer the bare stipulation that Dawson was a member of the Aryan Brotherhood, the Court concluded that the stipulation, standing alone, was not properly admitted as relevant character evidence. *Id.* at 167. However, the *Dawson* Court did not limit its opinion to that holding.

Particularly instructive here, the Supreme Court also offered guidance for future cases, where more than the bare stipulation offered in Dawson's case is presented:

> In many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society. *A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future.*

*Id.* at 166 (emphasis added). The thrust of the Court's commentary in *Dawson* is clear— evidence of a defendant's membership or association in an organized gang is relevant and admissible during sentencing *if* the State establishes that the gang's purposes and objectives are criminal in nature.

9

Were there any doubt as to the scope of the holding in *Dawson*, the cases decided since that opinion reaffirm that a sentencing court may consider a defendant's gang membership as relevant to the imposition of a proper sentence, so long as the evidence presented goes beyond the abstract beliefs of the gang. *United States v. Hernandez-Villanueva*, 473 F.3d 118 (4th Cir. 2007), provides one example.

The defendant, Hernandez-Villanueva, was convicted of unauthorized reentry into the United States. *Id.* at 123. During sentencing, the prosecution requested a sentence higher than that called for in the Sentencing Guidelines, citing Hernandez-Villanueva's MS-13 membership. *Id.* at 120. Sergeant Norris (the expert who testified in the case at bar) testified that, based on several factors, Hernandez-Villanueva remained a member of the gang as of the time of sentencing. *Id.* Sergeant Norris also testified about the history and practices of MS-13. He explained in part that:

> Some of the money paid in dues is remitted to MS-13; other money is used by the local gang for a variety of legal and illegal activities. In a nutshell, like most other street gangs, the basic purpose of MS-13 and each of its local gangs is "to control the streets, to be the number one gang." This purpose is achieved "through intimidation, fear, and violence."

*Id.*

The trial judge sentenced Hernandez-Villanueva to eighteen months imprisonment, exceeding the sentencing guidelines' recommended sentence of zero to six months. *Id.* The United States Court of Appeals for the Fourth Circuit upheld the sentence, concluding that the evidence regarding the MS-13 membership called for a higher sentence than in the guidelines, due in part to the violent nature of the gang. *Id.* at 123. The Fourth Circuit distinguished Sergeant Norris's testimony from the stipulation in *Dawson* and

10

"conclude[d] that all of th[o]se considerations support[ed] the decision of the court to impose a sentence above the advisory sentencing range and that any associational rights enjoyed by Villanueva were not violated." *Hernandez-Villanueva*, 473 F.3d at 123.

Other post-*Dawson* cases are to like effect. *See, e.g.*, *Mitchell*, 508 U.S. at 485-86, 490 (holding that a Wisconsin statute authorizing an enhanced sentence when a defendant intentionally selects a victim based on the victim's race does not violate free speech rights by purporting to punish the defendant's biased beliefs); *Schneider v. McDaniel*, 674 F.3d 1144, 1150 (9th Cir. 2012) (concluding that evidence of a defendant's membership in the Aryan Brotherhood was properly admitted during sentencing and stating that, "[i]n *Dawson*, the Supreme Court expressly recognized that the case would be different if the evidence proved something more than Dawson's abstract beliefs"); *Kapadia v. Tally*, 229 F.3d 641, 648 (7th Cir. 2000) ("Nothing in the Constitution prevents the sentencing court from factoring a defendant's statements [regarding his beliefs] into sentencing when those statements are relevant to the crime *or* to legitimate sentencing considerations.") (emphasis added); *People v. Coleman*, 633 N.E.2d 654, 673 (Ill. 1994) ("[U]nlike in *Dawson*, the evidence of defendant's gang affiliation was properly admitted here to show his behavior, violations, and discipline in prison. The information was not admitted for the sole purpose of showing defendant's abstract beliefs."); *State v. Cooks*, 720 So.2d 637, 650 (La. 1998) ("[T]he prosecution in the instant case escaped the trap illustrated in *Dawson* by introducing strong evidence to establish a relevant link between the defendant's character, his sentencing, and evidence of his gang involvement." (internal emphasis omitted)).

III

11

Cruz-Quintanilla contends, as he did before the Court of Special Appeals, that the First Amendment prohibits the circuit court from fashioning a sentence that at least in part was based on evidence of his membership in MS-13. Relying in large part upon *Dawson*, he argues that mere membership in a criminal gang is insufficient; there must be evidence of the defendant's personal connection to the criminal gang activity.

The State counters that "*Dawson* expressly sanctions the evidence presented in this case." The State emphasizes that the admissibility at sentencing of a defendant's gang membership does not turn on whether the government presents direct evidence of the defendant's past, present, or future commission of criminal acts on behalf of the gang. Rather, the State asserts, the proper inquiry is whether the evidence presented establishes the criminal nature of the gang.

The parties do not dispute that Cruz-Quintanilla's membership in MS-13 is subject to First Amendment protection. But, such protection is not absolute and does not render inadmissible any and all evidence relating to the gang. *See Dawson*, 503 U.S. at 165. As we shall explain, unlike the stipulation in *Dawson*, the evidence presented in this case provided sufficient and pertinent detail to render the evidence admissible during the sentencing hearing.

Cruz-Quintanilla leads with the contention that, because there is no direct evidence that he has performed or will perform criminal acts on behalf of the gang, his membership is not relevant to his character or his potential to be a future danger. We disagree. The evidence offered by the State at sentencing establishes that all MS-13 members must

12

commit a crime as part of "jumping-in"; they must engage in violent and criminal acts thereafter; and, if they do not, they are subject to punishment. The *Dawson* Court made clear that such evidence is admissible, even without direct evidence that the defendant engaged in such activity. *See Dawson*, 503 U.S. at 166 (observing that evidence of the Aryan Brotherhood's commission of any unlawful or violent acts, or even endorsement of such acts—as opposed to evidence of Dawson's individual criminal acts on behalf of the gang—would have been sufficient to be admitted during sentencing).

In furtherance of his argument that the evidence presented at sentencing did not demonstrate his personal connection to gang-related criminal activity, Cruz-Quintanilla asks us to adopt the three-part test from the United States Court of Appeals for the District of Columbia Circuit in *United States v. Lemon*, 723 F.2d 922 (D.C. Cir. 1983). That test, Cruz-Quintanilla asserts, requires that the evidence establish (1) the defendant's gang membership; (2) that the gang has illegal goals; and (3) a direct link between the defendant and the gang's illegal activity. *See id.* at 941-42. We reject the argument, for two reasons.

First, *Lemon* preceded by almost nine years the Supreme Court's decision in *Dawson*, and the *Dawson* Court did not discuss *Lemon* or even impliedly endorse the D.C. Circuit's analysis of the First Amendment issue presented there. Second, *Lemon* is far different from the case at bar. *Lemon* involved a defendant who, according to the prosecution, was a member of the Black Hebrews—a religious organization with alleged criminal goals. *See id.* at 925, 940. The D.C. Circuit assumed, for purposes of its analysis, Lemon's assertion that the group engaged in "legitimate" religious activities. *Id.* at 936-38. Based on the assumption that the Black Hebrews "embraces both illegal and legal

13

aims," the federal appeals court determined that "there must be sufficiently reliable evidence of the defendant's connection to illegal activity within the Black Hebrews to insure that he is not being given a harsher sentence for mere association with the group *and its legitimate aims and activities*." *Id.* at 939-40 (emphasis added).

Unlike in *Lemon* and fully in keeping with the principles set forth by the Supreme Court in *Dawson*, the only evidence offered at Cruz-Quintanilla's sentencing hearing established that MS-13's objectives, well known to its members, are to "kill, rape, and control"; to become a member, one must commit a crime; and all members of the gang know that they are expected to "participate in violence" or be subject to discipline by other gang members. Because MS-13 has not been shown to be a religious or political organization with both illegal and legal aims, the evidence of the criminal nature of the gang alone was sufficient for sentencing purposes. Cruz-Quintanilla is not being punished for mere association with a group and its legitimate aims and activities.

In short, unlike in *Dawson*, the testimony in the present case went beyond any abstract beliefs and established that all MS-13 gang members engage in "unlawful or violent acts, or . . . endorse[] such acts." *See Dawson*, 503 U.S. at 166. We therefore agree with the Court of Special Appeals that, "the evidence regarding MS-13 was not limited to the constitutionally protected beliefs of the gang" and "[i]t would be reasonable to infer from the evidence that as a documented member of MS-13, [Cruz-Quintanilla] endorses not just MS-13's beliefs, but also its criminal activities." *Cruz-Quintanilla*, 228 Md. App. at 69. The sentencing court did not err or abuse its discretion in admitting that evidence and considering it in fashioning an appropriate sentence.

14

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**