In the
United States Court of Appeals
For the Seventh Circuit

No. 98-1654

AMYN KAPADIA,

Plaintiff-Appellant,

v.

RODNEY L. TALLY,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 7929--David H. Coar, Judge.


Argued November 30, 1999--Decided October 12, 2000


Before MANION, KANNE and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.  Amyn Kapadia was
convicted in the Circuit Court of Cook County,
Illinois of burglary and arson of a Jewish
community center. The trial court judge meted out
the harshest sentence possible under state law,
a fourteen year term of imprisonment, after a
courtroom deputy testified that Kapadia uttered
a number of anti-Semitic slurs on his way out of
court after being convicted. Kapadia complains
that enhancing his sentence because he professes
vile beliefs violates his First Amendment rights.
However, the trial court enhanced Kapadia's
sentence because of his poor rehabilitative
potential and his future dangerousness and not
because of his anti-Semitic speech, and we
therefore affirm the district court's denial of
Kapadia's petition for habeas corpus.
I.

We take the facts as the trial court found them
to be. In November 1993, Amyn Kapadia and Jason
Wiederhold burglarized and set fire to the
Friends of Refugees of Eastern Europe center (the
"F.R.E.E. center"). The F.R.E.E. center was a
Jewish Orthodox organization that provided
services to recent Russian Jewish immigrants. In
addition to a reception area, kitchen, business
offices, vocational offices and a study, the
center housed a small synagogue where religious
services were held. After a bench trial, the

court found both defendants guilty and set a date for a sentencing hearing. On his way out of the courtroom, Kapadia said to Deputy Joseph Bennett, "You can tell the Judge for me . . . that he's a bitch and fuck the Jews." Later that day, while in lockup, Kapadia asked Deputy Bennett whether "that Judge is a Jew, too?" and then answered his own question by stating, "I'll bet he is that fucking schmuck." At another time, Deputy Bennett also heard Kapadia mutter, "Those fucking Jews." Another deputy also heard Kapadia say, "Fucking Jews, man," as he was being escorted into lockup after a court date in his case. Deputy Bennett passed these remarks on to the trial judge before the sentencing hearing, and the trial judge told the Deputy to inform both the prosecution and the defense about the remarks. At the sentencing hearing, the prosecution urged the judge to sentence Kapadia to "substantial penitentiary time," at least in part because the crime was committed against a Jewish community organization that aided Russian immigrants who came to the United States to escape persecution only to "run into the likes of Amyn Kapadia." R. 1, Ex. C at A-10. Because the prosecution raised this issue, the court asked the parties whether either intended to call Deputy Bennett as a witness. Both the defense and the prosecution declined the court's invitation. The trial judge then stated, "The record should reflect then that I will not consider either the remark about me or about the Jewish community in aggravation. I'll proceed strictly on the basis of what is in the record." R. 1, Ex. C at A-11.

The trial court then solicited argument regarding mitigation from Kapadia's counsel. Kapadia's counsel stated:

Judge, by way of argument, I object strenuously for the state's attorney trying to introduce race into this argument. There has been absolutely no suggestion during the trial, the conduct of the trial, the conduct of the people involved in the trial, that the fact that this was a Jewish synagogue had anything to do with anything, especially the conduct of my client.

R. 1, Ex. C at A-11. The trial judge replied:

You're absolutely right. That's why Deputy Bennett has to be here. Order of court, this matter is put over to September 23rd. Subpoena Deputy Bennett. Your point is well-taken. It's important aggravating information. You, of course, were informed by Deputy Bennett, because I told him to inform you, so you are not unaware of this. But based upon that information that I received that is of record, I have to dispute what you have to say. Since I'm actually aware of

that, I ought to be also legally aware of that.

R. 1, Ex. C at A-11 through A-12. At the continued sentencing hearing, Deputy Bennett testified to the anti-Semitic remarks Kapadia uttered at various times. The sentencing judge then heard the argument of counsel and remarked that he had been called more names than any other professional except a tax collector. He continued:

What troubles me, of course, is the vitriol directed towards the group that also happens to be the victims. Talk about the larger group, the societal group, East European Jews who are the victims in this case. I did take the comments into consideration because one of the things I have to consider is the possibility of reformation of the defendant. How likely is this defendant to be restored to useful citizenship.

R. 1, Ex. C at C-25. The court went on to comment on the lessons of history, and the anti-Semitic hooliganism that preceded Krystalnacht, the "night of broken glass" in 1938 when 1700 synagogues and Jewish-owned businesses were destroyed by mobs led by Nazi party members, leading to the deaths of a very large number of Jewish individuals. The court then remarked:

I take these matters into very, very serious consideration in the case of Mr. Kapadia, therefore, because his virulent anti-Semitism is indicative of the fact [that] he is not likely to change his ways. He is not likely to become a productive member of society. So, it's certainly a[n] aggravating factor.

R. 1, Ex. C at C-27 through C-28. The court then sentenced Kapadia to a fourteen year term of imprisonment, the longest term allowed under Illinois law for burglary and arson. The court sentenced Wiederhold to a five year term of imprisonment, reasoning that his conduct was caused at least in part by his association with "the tumultuous and virulent Mr. Kapadia," and that he was therefore less culpable than Kapadia, and could conceivably be re-integrated into society. R. 1, Ex. C at C-28.

  Kapadia appealed his sentence through the Illinois courts. The Appellate Court affirmed, and the Illinois Supreme Court declined to hear the case. Kapadia then filed a petition for a writ of habeas corpus in the district court, contending that enhancing his sentence on the basis of his anti-Semitic remarks was unconstitutional because the sentencing judge made no finding tying the remarks to his motivation to commit the crime. He argued that

the trial court violated his First Amendment rights when the court used his protected speech as evidence of character and rehabilitative potential. The district court denied his petition and he appeals.

## II.

Under the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), we defer to state court merit adjudications. Sanchez v. Gilmore, 189 F.3d 619, 623 (7th Cir. 1999), cert. denied, 120 S. Ct. 1724 (2000). To obtain habeas corpus relief under the AEDPA, Kapadia must show that the state court determinations under review are either contrary to or employ an unreasonable application of federal law as determined by the United States Supreme Court. Id. Kapadia may also attack the state court's adjudication on the ground that it is an unreasonable determination of the facts, although we presume state court factual findings are correct unless the petitioner rebuts the presumption with clear and convincing evidence. Id. We review state court legal conclusions de novo, and we apply that same standard to mixed questions of law and fact. Id. Kapadia complains that the trial court did not tie his anti-Semitic statements to his crime and therefore punished him solely for expressing an unpopular opinion. Because Kapadia must show that the state court determinations under review are either contrary to or employ an unreasonable application of federal law as determined by the United States Supreme Court, we turn first to the Supreme Court cases on which Kapadia relies.

## A.

In Barclay v. Florida, 463 U.S. 939, 948-51 (1983), a plurality of the Court rejected a capital defendant's claim that the sentencing judge had improperly injected a non-statutory aggravating factor of racial hatred into his sentencing consideration. Barclay belonged to a group that called itself the Black Liberation Army, a group that desired to start a race war. Together with four other men, Barclay murdered a white man and pinned a racist note to his body with a knife. The sentencing judge found, among other things, that the murder had been especially heinous, atrocious or cruel, an aggravating factor under Florida law. The judge compared Barclay's conduct to that of the Nazis in perpetuating a race war, and commented extensively on his own experiences on the battlefields of Europe. A plurality of the Court affirmed that the Constitution did not prohibit the trial judge from taking into account the elements of racial hatred in the murder, particularly because Barclay's desire to start a race war was relevant to a number of statutory

aggravating factors. Barclay, 463 U.S at 949-50.

   The Court expounded on this theme in Dawson v. Delaware, 503 U.S. 159, 166-69 (1992), another capital murder case involving a defendant who belonged to a racist organization. After escaping from prison, Dawson murdered a white woman in her home in the course of stealing her money and her car. During the sentencing phase of the trial, the prosecution sought to admit into evidence Dawson's association with the Aryan Brotherhood, and the trial court entered a stipulation (over Dawson's continuing objection) describing the Aryan Brotherhood as a white racist prison gang that originated in California in response to other gangs of racial minorities. The stipulation stated that separate groups calling themselves the Aryan Brotherhood existed in many state prisons including Delaware. The jury also learned that Dawson had the words "Aryan Brotherhood" tattooed on his hand. After hearing other aggravating evidence, the jury recommended a death sentence for Dawson, a recommendation the trial court was bound to impose. The Supreme Court of Delaware affirmed the sentence, reasoning that allowing evidence of character where character is a relevant inquiry was distinguishable from punishing a person for expressing his views. See 503 U.S. at 163. The United States Supreme Court acknowledged that it had in Barclay upheld the consideration of evidence of racial intolerance and subversive advocacy where that evidence was relevant to the issues involved. Dawson, 503 U.S. at 164. The Court also reaffirmed its holding in United States v. Abel, 469 U.S. 45 (1984), that the Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment. Dawson, 503 U.S. at 165. The Court drew the line in Dawson's case, however, because the information presented to the jury at Dawson's trial was so narrow as to be irrelevant to any legitimate sentencing issue. The Court stated that if other credible, admissible evidence had been introduced to show, as the prosecution originally intended to demonstrate, that the Aryan Brotherhood was a white racist prison gang associated with drugs and violent escape attempts, and that advocates the murder of fellow prisoners, it would be a different case. In the narrow form in which the information was introduced, the Court held, it was irrelevant to the sentencing proceeding because it was not, for example, tied in any manner to the murder of a white woman. The crime itself did not involve elements of racial hatred. Dawson, 503 U.S. at 166.

Because the evidence of membership proved nothing more than Dawson's abstract beliefs, the Court held that the admission of that evidence violated Dawson's First Amendment rights. 503 U.S. at 167. Had the prosecution proved that the Aryan Brotherhood committed unlawful or violent acts, or had even endorsed such acts, the evidence might have been relevant to prove aggravating circumstances, and thus would not have been barred by the First Amendment. "In many case, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society." 503 U.S. at 166. Membership in an organization that endorsed the killing of an identifiable group, thus, would be relevant to a jury's inquiry into whether the defendant will be dangerous in the future. Id. The Court rejected the government's argument that membership in the group showed Dawson's "character," a relevant sentencing factor under Delaware law. Without evidence showing more than abstract beliefs, the Court found that recasting the evidence as relevant to "character" could not save it from First Amendment scrutiny. The Court concluded that the First Amendment prevents a state "from employing evidence of a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried." 503 U.S at 168.

The Court considered a slightly different permutation of this theme in Wisconsin v. Mitchell, 508 U.S. 476 (1993). There the Court held that a penalty enhancement based on the defendant's purposeful selection of his victim on account of the victim's race was not prohibited by the First or the Fourteenth Amendments. Mitchell was part of a group of young black men and boys who had become agitated during a discussion of a movie that contained a scene in which a white man beat a black youth. Following this discussion, Mitchell instigated an attack on a white youth who happened to walk past the group. The group beat the white youth severely, rendering him unconscious and in a coma for four days. A Wisconsin statute allowed an enhancement to a sentence for aggravated battery when the defendant intentionally selected the victim because of race, religion, color, disability, sexual orientation, national origin or ancestry. Mitchell challenged the enhancement on the ground that it violated his First Amendment rights by punishing him for his thoughts. The Wisconsin Supreme Court agreed that the statute punished what it deemed to be offensive thought because the statute punished the motive behind the selection of the victim, and therefore held the statute unconstitutional. The United States Supreme Court acknowledged that the statute

punished the same crime differently when the victim was selected based on his or her race or other protected status, and that the statute enhanced the penalty based solely on the defendant's discriminatory motive in selecting the victim. The Court noted that motive has long been held to be a relevant factor in determining the length of a sentence, but that abstract beliefs alone may not be taken into consideration by a sentencing judge. Mitchell, 508 U.S. 487.

The Court upheld the Wisconsin statute because the legislature believed that bias-inspired conduct inflicted greater individual and societal harm. For example, such crimes are more likely to provoke retaliatory crimes, inflict distinct emotional harms on their victims, and incite community unrest. Mitchell, 508 U.S. at 487-88. The State's desire to redress these perceived harms provides an adequate explanation for its penalty-enhancement provision over and above mere disagreement with offenders' beliefs or biases. As Blackstone said long ago, "it is but reasonable that among crimes of different natures those should be most severely punished which are the most destructive of the public safety and happiness."

Mitchell, 508 U.S at 498 (citing 4 W. Blackstone, Commentaries, at 16). The Court concluded that the First Amendment does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. 508 U.S at 499.

Kapadia also relies on R.A.V. v. City of St. Paul, Minnesota, 505 U.S. 377 (1992), a case invalidating a municipal ordinance that criminalized as disorderly conduct the placing upon public or private property of a symbol, object or graffiti including, among other things, a burning cross or a Nazi swastika "which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." R.A.V. was a teenager who placed a burning cross inside the fenced yard of a black family. The Court acknowledged that the Minnesota Supreme Court limited the application of the law to fighting words that insult or provoke violence on the basis of race, color, creed, religion or gender. The Court found that this limitation was inadequate to save the ordinance because it discriminated not only on the basis of content but also on the basis of viewpoint. Fighting words unrelated to the protected topics remained unregulated, and placards using fighting words in support of racial tolerance, for example, were permissible while opponents of tolerance were not allowed to speak. R.A.V., 505 U.S. at 391-92.

Fighting words could be restricted, according to the Court, because it was the non-speech element of the words, the manner of speech, that such laws sought to prohibit. This statute failed to pass muster because it discriminated between different categories of fighting words based on content and viewpoint. 505 U.S. at 385-86.

B.

Kapadia, of course, argues that enhancing his sentence for his post-trial anti-Semitic statements more closely tracks the unconstitutional practices in R.A.V. and Dawson than the permissible enhancements in Barclay and Mitchell. Kapadia points to the sentencing judge's discussion of his character and rehabilitation potential as evidence that the court sentenced him for holding offensive views rather than for the allowable purpose of punishing a crime motivated by racial intolerance. In order to pass muster, according to Kapadia, the court must first find that Kapadia's offensive statements were tied to the crime in a manner that is relevant to the sentencing considerations. Kapadia contends he was punished for his abstract beliefs as in Dawson rather than because of his motive or future dangerousness as in Barclay and Mitchell. Kapadia concedes that had he painted on the walls of the F.R.E.E. center the same slogans he later uttered to the deputy, he would not be able to make a constitutional challenge under the cases we discuss above. He complains that because the state court found no religious motivation on his part in committing the offense, and because the state court made no specific finding that he selected the property because of the religious affiliation of the owners, his case is distinguished from Barclay. He admits that as long as motive is being punished, the First Amendment is not implicated. The state contends that the court based the enhancement not on improper considerations but rather on Kapadia's criminal history./1 The state also maintains that Kapadia's anti-Semitic statements were tied to his crimes of burglary and arson of a Jewish community center and therefore the court could properly use the statements to enhance his sentence, if for no other reason than because his statements showed he lacked remorse. With that, we return to the sentencing court's statements at Kapadia's two sentencing hearings.

Kapadia's counsel argued to the court that there was no evidence that the fact that this was a Jewish organization had anything to do with Kapadia's conduct. The court replied, "You're absolutely right. That's why Deputy Bennett has to be here." In other words, the court considered

the deputy's testimony to be evidence of a connection between Kapadia's conduct and the Jewish affiliation of the F.R.E.E. center. Implicit in the court's comments is the finding that Kapadia's conduct was tied to his anti-Semitic bias, and that the court wanted the deputy's statement on the record to lend support to that finding. The sentencing judge, after receiving the deputy's statement into evidence, said that he took Kapadia's comments into consideration because he believed Kapadia was less likely to be reformed. He found Kapadia more dangerous because he held anti-Semitic views and attacked a Jewish community center. In other words, because Kapadia held these views and had committed a bias-motivated crime, there was a greater probability he would not be rehabilitated. The timing of Kapadia's slurs also played into the sentencing court's analysis. Because Kapadia's remarks came after his conviction, the sentencing judge was free to conclude that he lacked remorse and was less likely to be rehabilitated. This is just another way of stating that Kapadia presented a threat of future dangerousness to the community, a proper consideration under Barclay and Mitchell. Finally, the court noted the tie between Kapadia's behavior and crimes which occurred in Europe during the rise of the Nazi regime. Under Mitchell, this was also an appropriate consideration, not barred by the First Amendment.

The court's comparison of Kapadia's criminal destruction of the F.R.E.E. center to Nazi attacks on synagogues removes any doubt that the court enhanced Kapadia's sentence because it believed that Kapadia's anti-Semitism was tied to his crime. Unlike the defendants in R.A.V. and Dawson, Kapadia was not punished for his abstract beliefs but rather for committing a crime motivated by bias against the very group of people he maligned with his hateful invective. He did not burglarize and set fire to a Walmart, for example, or some other business with no particular affiliation, and then utter anti-Semitic slurs. Indeed, when the police questioned Kapadia and asked him whether he knew what the place was that he burglarized, he replied, "I thought it was an office but I knew there was a lot of Jewish people in there." R.18, Ex. A. The fact that he did not spray his slogans on the walls but rather uttered them after his conviction is irrelevant. The court was free to infer from his post-trial statements that he held the same views at the time of the crime and was motivated by those views in selecting the victim. The First Amendment does not bar consideration of these statements at sentencing when they are indicative of motive and future dangerousness,

and we think the sentencing court's comments make plain enough that it was considering the remarks as such.

Our conclusion is bolstered by the findings of the Illinois Appellate Court, whose interpretation we owe deference as well. See People v. Kapadia, 667 N.E.2d 577, 580 (Ill. App. 1 Dist. 1996). That court held that Kapadia's statement provided insight into not only Kapadia's character but also his lack of remorse and rehabilitative potential. Lack of remorse and poor rehabilitative potential are traditionally very important considerations for any sentencing judge, and the fact that the court's analysis of these factors is based on the defendant's otherwise protected speech does not render their consideration constitutionally infirm. As the Appellate Court noted, "[R]ead in context, the court's remarks at sentencing weighed defendant's statements in the context of his attitude towards the victims, his lack of remorse, and lack of potential for rehabilitation." 667 N.E.2d at 580. Nothing in the Constitution prevents the sentencing court from factoring a defendant's statements into sentencing when those statements are relevant to the crime or to legitimate sentencing considerations. Because the sentencing court was not punishing Kapadia for his abstract beliefs but rather for his concrete application of those misguided beliefs in criminal activity, we affirm the judgment of the district court.

AFFIRMED.

/1 Although the sentencing court could have enhanced Kapadia's sentence under state law for his criminal history, there is no indication in the record that this is what the court actually did. Because this theory is without support in the record, we therefore reject the state's argument that criminal history was an adequate basis for the sentence enhancement.

MANION, Circuit Judge, concurring. I concur with the court's decision to affirm the district court's denial of Kapadia's petition for habeas corpus. But under the circumstances of this case, there is no need to explore the question of whether Kapadia was motivated by religious or national origin bias when he committed the burglary and arson. Evidence of one's beliefs and associations is admissible where it is relevant to the statutory aggravating factors. Barclay v. Florida, 463 U.S. 939, 949-50 (1983). Kapadia's

bias was demonstrated in statements made after his conviction and before sentencing. As the trial judge noted, he took the vitriolic comments into consideration at sentencing because he had to "consider . . . the possibility of reformation of the defendant . . . . [H]is virulant antisemitism is indicative of the fact that he is not likely to change his ways. He is not likely to become a productive member of society." R,1, Ex. C. at C25-28. And as the Illinois appellate court indicated, this was an appropriate consideration for sentencing. It concluded that Kapadia's racial and religious slurs "provided insight into defendant's character, mentality, attitude, lack of remorse, and rehabilitative potential." People v. Kapadia, 667 N.E.2d 577, 580 (Ill. App. Ct. 1996). This court's opinion notes that nothing in the Constitution prevents the court "from factoring a defendant's statements into sentencing" when those statements are relevant to legitimate sentencing considerations. Because these are relevant factors to consider upon sentencing, it is unnecessary to explore whether Kapadia was motivated by religious bias when committing his crimes.