In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1259

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERIK C. SCHMIDT,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:17-cr-00136-WCG-1 — **William C. Griesbach**, *Chief Judge.*

ARGUED NOVEMBER 2, 2018 — DECIDED JULY 17, 2019

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Erik Schmidt and his girlfriend were camping in a national forest in Wisconsin when a United States Forest Service Officer approached their campsite. The officer discovered that Mr. Schmidt, who had three prior felony convictions, had a handgun in his tent. A grand jury indicted Mr. Schmidt for, and he pleaded guilty to, one count of possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). During a presentence interview with

his probation officer, Mr. Schmidt communicated to the of-
ficer his belief in white supremacy, his hatred for minority
races, and his desire to return to Germany to embrace his
Nazi roots. At sentencing, the district court determined that
Mr. Schmidt's white supremacist beliefs were evidence of his
likelihood of future dangerousness and his lack of respect
for the law. The district court sentenced Mr. Schmidt to 48
months' imprisonment, followed by three years of super-
vised release.[1] Mr. Schmidt now contends that the district
court violated his First Amendment rights when it consid-
ered his white supremacist beliefs at his sentencing. Because
Mr. Schmidt's beliefs were relevant to legitimate sentencing
considerations, we affirm the judgment of the district court.[2]

# I

# BACKGROUND

On July 29, 2017, Mr. Schmidt and his girlfriend were
camping in the Chequamegon-Nicolet National Forest in
Forest County, Wisconsin. When U.S. Forest Service Officer
Charles Brooks approached their campsite, he noticed a
quantity of freshly cut logs on a trailer. Because chopping
and removing live trees from a national forest without a
permit are federal offenses, *see* 18 U.S.C. §§ 1852 and 1853,
Officer Brooks prepared to issue a citation. He also observed
that Mr. Schmidt was wearing a holster for a handgun at-

---

[1] The district court had jurisdiction under 18 U.S.C. § 3231.

[2] We have jurisdiction over this appeal under 28 U.S.C. § 1291 and 18
U.S.C. § 3742.

tached to his belt, and Mr. Schmidt acknowledged that there was a gun in his tent. Officer Brooks contacted the Sheriff's Department and discovered that Mr. Schmidt had three prior felony convictions. When questioned by the officer, Mr. Schmidt admitted that he was a convicted felon, but contended that the gun and the pants he was wearing belonged to his girlfriend. She turned the handgun over to Officer Brooks.

On August 8, 2017, a grand jury indicted Mr. Schmidt for one count of possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). He pleaded guilty to the indictment and agreed to pay $1,600 in restitution to the U.S. Forest Service for having cut down trees in the national forest without authorization.

In preparation for Mr. Schmidt's sentencing, the probation office prepared a presentence report, which calculated a guidelines range of 51 to 63 months' imprisonment based on a total offense level of 17 and a criminal history category of VI. According to that report, Mr. Schmidt had 17 adult criminal convictions, including 3 felony convictions under Wisconsin law for bail jumping, child abuse, and taking and driving a vehicle without the owner's consent. His other prior convictions included unlawful use of the phone to threaten harm, criminal damage to property, carrying a concealed weapon, and multiple convictions for disorderly conduct

and resisting an officer.[3] None of his prior convictions in-
volved hate crimes.

During his interview with the probation officer,
Mr. Schmidt told the officer of his belief in white supremacy
and of his desire to return to Germany to embrace his Nazi
heritage. Consequently, in his sentencing recommendation,
the probation officer wrote:

> [Mr. Schmidt] is [] a self-avowed white su-
> premacist, who readily and reprehensibly ar-
> ticulated his bigoted hatred for minority races
> during the presentence interview, despite ad-
> vice to the contrary from counsel. Mr. Schmidt
> further indicated a strong desire to leave the
> United States, a country he repeatedly pro-
> fessed his hatred for due to its allowance of
> these same minorities to have civil rights, and
> proclaimed a strong desire to relocate to Ger-
> many to retrace his Nazi ancestral heritage.[4]

The probation officer added that Mr. Schmidt "has
shown repeated disrespect and disregard to individuals in
positions of authority, to include law enforcement officers;
and has readily embraced and openly expressed viewpoints
of prejudice and intolerance, and a gregarious hatred for the

---

[3] We have reviewed the descriptions of these offenses in the presentence
report. They contain ample evidence to support the district court's esti-
mation of Mr. Schmidt's predilection for violence and threats of violence.

[4] R.21 at 2.

United States."[5] Mr. Schmidt also admitted having a tattoo of a swastika on his back.

On January 26, 2018, the district court conducted a sentencing hearing. The Government recommended a sentence of 36 months' imprisonment; Mr. Schmidt requested a sentence of probation. After adopting the presentence report's guidelines recommended range of 51 to 63 months, the district court observed that the guidelines range was a "starting point" and that "the real sentencing determination is made … from considering two factors, the nature and circumstances of the offense and the history and character of the Defendant."[6]

Regarding the seriousness of the offense of conviction, the court observed that Mr. Schmidt is a three-time convicted felon. Further, the court noted, "Congress is trying to send a very clear message that people that have engaged in … the type of conduct that lands a person in prison … are not to possess firearms because of the very dangerous nature of those particular types of devices and weapons."[7]

Moving to Mr. Schmidt's history and character, the district court began by stating: "I think the ideas that are reflected in the Presentence Report and particularly in the introduction are dangerous and they make a person who holds them and *with a history like this* dangerous."[8] The court fur-

---

[5] *Id.* at 3.

[6] R.38 at 24.

[7] *Id.* at 26.

[8] *Id.* at 30 (emphasis added).

ther elaborated that "when asked to assess the seriousness of an offense and the character of the Defendant," the sentencing judge "appropriately looks at the motivating ideas or the ideas that a person has in trying to assess that person's character" and "whether that person represents a danger to the public."[9] In this case, the court indicated that it did not "put a great deal of weight" on Mr. Schmidt's white supremacist beliefs "because this offense … does not involve the use of the gun for this purpose."[10] The court observed, however, that it was alarmed "that a person holding these ideas has so little respect for the law."[11]

Next, the court considered Mr. Schmidt's criminal history, which began at age 18 and involved 17 criminal convictions over the past 15 years.[12] Further, the court observed that Mr. Schmidt's white supremacist beliefs were evidence of his continued dangerousness:

> He's now 32. These aren't the words of a youthful offender. … [T]hese are the words of someone who has—at this point in life ought to know better and they represent a threat and if he holds those ideas and people—as I said, ideas matter. People do things based on their ideas and if these are his ideas, he is a very dangerous person.

---

[9] *Id.* at 31.

[10] *Id.*

[11] *Id.*

[12] *See supra* p.3 and note 3.

> Now, as I said, I'm sentencing him for an offense, not for his ideas but I am—it seems to me I appropriately can consider those in deciding an important factor which is whether he represents a threat … to the community and whether he is a future danger.[13]

Based on the nature of the offense, Mr. Schmidt's history and character, and the need for deterrence, the district court imposed a sentence of 48 months' imprisonment, followed by a three-year term of supervised release. The court summarized its determination by saying:

> I have not put great weight on the guidelines but I certainly think that the nature of this offense, a possession of a firearm as a convicted felon—three-time convicted felon and with a history of violence and the kinds of threats that have been issued by this person to others throughout the course of his life and the absence of ties, really, to a community make the sentence appropriate and a reasonable approach.
>
> I think it's necessary also for deterrent purposes. These are the types of crimes, the possession of firearms by people convicted is something every community tries to stop. We have a Constitutional right to possess firearms assuming we have not forfeited that right by virtue of criminal conduct and this is—the pos-

---

[13] R.38 at 32.

session and—of a gun in this fashion is a serious matter. I also think it's—so I think it serves deterrence, it's punishment and, of course, protection of the public.[14]

Following the entry of final judgment, Mr. Schmidt timely appealed.

## II

## DISCUSSION

### A.

Mr. Schmidt contends that the district court violated his First Amendment rights because it sentenced him "in part based upon his abstract belief in white supremacy that bore no relation to the offense of conviction."[15]

We begin by setting forth the principles that must guide our assessment of this argument. A judge's obligation at sentencing is clear. "A sentencing judge must first calculate the applicable guidelines range, then apply the [18 U.S.C.] § 3553(a) factors, and finally arrive at a reasonable sentence." *United States v. Lua-Guizar*, 656 F.3d 563, 566 (7th Cir. 2011). The court must "give meaningful consideration" to the § 3553(a) factors, "which include the history and characteristics of the defendant, the nature and circumstances of the offense, the seriousness of the offense, the promotion of respect for the law, just punishment for the offense,

---

[14] *Id.* at 33.

[15] Appellant's Br. 9.

… deterrence to criminal conduct, and protection of the public from further crimes by the defendant." *United States v. Christiansen*, 594 F.3d 571, 576 (7th Cir. 2010). "Although the court is not required to discuss every factor set forth under § 3553(a), it must articulate the particular factors it considered in sentencing." *Id.* at 576–77.

A sentencing judge also must safeguard a defendant's First Amendment expression and associational rights during the sentencing process. Supreme Court precedent and the cases of this court provide ample guidance in this respect. In *Barclay v. Florida*, 463 U.S. 939 (1983), the defendant sought to vacate his sentence "because the trial judge, in explaining his sentencing decision, discussed the racial motive for the murder." *Id.* at 948. The jury had convicted Barclay of murdering a white man while a member of the Black Liberation Army, "whose apparent sole purpose was to indiscriminately kill white persons and to start a revolution and a racial war." *Id.* at 942 (internal quotation marks omitted). The sentencing court "found Barclay's desire to start a race war relevant to several statutory aggravating factors," justifying the death penalty. *Id.* at 949. In rejecting Barclay's Eighth Amendment challenge, the Supreme Court held that "[t]he United States Constitution does not prohibit a trial judge from taking into account the elements of racial hatred in this murder." *Id.* The Court reasoned that "[a]ny sentencing decision calls for the exercise of judgment," and that the trial court's discussion of Barclay's racial hatred was "neither irrational nor arbitrary." *Id.* at 950, 949.

The Court again encountered this issue in *Dawson v. Delaware*, 503 U.S. 159 (1992). A jury had convicted Dawson of first-degree murder. During a capital sentencing proceeding,

he challenged, on First Amendment grounds, the introduction of evidence of his membership in the Aryan Brotherhood. The State introduced at the penalty hearing a stipulation stating that:

> The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware.

*Id.* at 162 (internal quotation marks omitted). The prosecution also "introduced evidence that Dawson had tattooed the words 'Aryan Brotherhood' on his hand" and that he referred to himself as "'Abaddon,' which he said meant 'one of Satan's disciples.'" *Id.* at 162, 161 (alteration omitted). Based on the jury's recommendation, the trial court imposed the death penalty. *Id.* at 163.

Dawson submitted that "the Constitution forbids the consideration in sentencing of any evidence concerning beliefs or activities that are protected under the First Amendment." *Id.* at 164. Noting its decision in *Barclay*, the Supreme Court rejected Dawson's formulation as "too broad." *Id.* The Court emphasized "that 'the sentencing authority has always been free to consider a wide range of relevant material.'" *Id.* (quoting *Payne v. Tennessee*, 501 U.S. 808, 820–21 (1991)). Consequently, continued the Court, "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Id.* at 165. Nevertheless, in Dawson's case, the stipulation about his membership in the Ary-

an Brotherhood constituted constitutional error because there was no connection between the narrow stipulation and a relevant aggravating or mitigating factor in the sentencing procedure. "The brief stipulation proved only that an Aryan Brotherhood prison gang originated in California in the 1960's, that it entertain[ed] white racist beliefs, and that a separate gang in the Delaware prison system call[ed] itself the Aryan Brotherhood." *Id.* The Court concluded that "the narrowness of the stipulation left the Aryan Brotherhood evidence totally without relevance to Dawson's sentencing proceeding." *Id.* In particular, evidence of his membership "was not tied in any way to the murder of Dawson's victim," and therefore was "not relevant to help prove any aggravating circumstance," or to "rebut any mitigating evidence offered by Dawson." *Id.* at 166–67. The Court therefore decided that "Dawson's First Amendment rights were violated by the admission of the Aryan Brotherhood evidence in this case, because the evidence proved nothing more than Dawson's abstract beliefs." *Id.* at 167.

The Court's reasoning in *Dawson* suggested that evidence of a defendant's protected associations or beliefs *would* be relevant at sentencing *if* the Government tied that evidence to the offense of conviction or introduced it to rebut mitigating evidence. *Id.* at 166–67. The evidence could be "relevant to help prove any aggravating circumstance[s]" given that, "[i]n many cases, … associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society." *Id.* at 166. Specifically, the Court reasoned, "[a] defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future." *Id.*

*Dawson* and *Barclay* were the Court's guideposts when it returned to a defendant's associational rights in the sentencing process in *Wisconsin v. Mitchell*, 508 U.S. 476 (1993). A jury convicted Mitchell of aggravated battery and found that he "had intentionally selected his victim because of the boy's race," triggering a Wisconsin penalty-enhancement statute. *Id.* at 480. "Because the only reason for the enhancement [wa]s the defendant's discriminatory motive for selecting his victim, Mitchell argue[d] … that the statute violate[d] the First Amendment by punishing offenders' bigoted beliefs." *Id.* at 485. The Supreme Court rejected this argument. While reiterating its statement in *Dawson* that a defendant's abstract beliefs may not be taken into consideration by the sentencing judge, it also recalled its statement that "the Constitution does not erect a *per se* barrier to the admission of evidence" of the defendant's beliefs and associations. *Id.* at 486 (quoting *Dawson*, 503 U.S. at 165). Specifically, noted the Court, those beliefs and associations are admissible when they are relevant to establish a forbidden animus or intent or when they are relevant to another sentencing factor. *Id.* at 486–88.

Our court has followed the Supreme Court's guidance when addressing a First Amendment challenge to a sentencing enhancement in *Kapadia v. Tally*, 229 F.3d 641 (7th Cir. 2000). At Kapadia's sentencing for burglary and arson of a Jewish community center, a courtroom deputy testified that he had overheard Kapadia utter several anti-Semitic slurs at various times following his trial. *Id.* at 642. The sentencing judge noted that he was "trouble[d]" by "the vitriol directed towards the group that also happen[ed] to be the victims" of Kapadia's crimes. *Id.* at 643 (internal quotation marks omitted). Further, the court stated that it "did take the comments

into consideration because one of the things [the court has] to consider is the possibility of reformation of the defendant. How likely is this defendant to be restored to useful citizenship." *Id.* (internal quotation marks omitted). The court further observed that Kapadia's "virulent anti-Semitism [was] indicative of the fact that he [was] not likely to change his ways" and was "not likely to become a productive member of society." *Id.* (internal quotation marks omitted) (alteration omitted). The trial court then sentenced him to the statutory maximum term of imprisonment. When the case came before us on collateral review, Kapadia argued that the sentencing court "did not tie his anti-Semitic statements to his crime and therefore punished him solely for expressing an unpopular opinion." *Id.* at 644.

We rejected this argument. We held that "[n]othing in the Constitution prevents the sentencing court from factoring a defendant's statements into sentencing when those statements are relevant to the crime *or to legitimate sentencing considerations*." *Id.* at 648 (emphasis added). We explained that the sentencing judge "found Kapadia more dangerous because he held anti-Semitic views and attacked a Jewish community center." *Id.* at 647. "[B]ecause Kapadia held these views and had committed a bias-motivated crime," we observed, "there was a greater probability he would not be rehabilitated." *Id.* This was "just another way of stating that Kapadia presented a threat of future dangerousness to the community, a proper consideration under *Barclay* and *Mitchell*." *Id.* We distinguished *Dawson* on the ground that "Kapadia was not punished for his abstract beliefs but rather for committing a crime motivated by bias against the very group of people he maligned with his hateful invective." *Id.* at 648. We reiterated that "[t]he First Amendment does not

bar consideration of these statements at sentencing when they are indicative of motive and future dangerousness," and we concluded that "the sentencing court's comments ma[de] plain enough that it was considering the remarks as such." *Id.*

Our sister circuits also have held that a sentencing court can properly consider a defendant's beliefs or associations as relevant to an estimation of his future dangerousness. For instance, in *Fuller v. Johnson*, 114 F.3d 491 (5th Cir. 1997), the court rejected Fuller's claim that the introduction of "testimony that he was a member of the Aryan Brotherhood prison gang" and testimony "about the gang and its beliefs" "as an aggravating factor supporting the death penalty violated his First Amendment rights of freedom of belief and association." *Id.* at 497–98. Distinguishing *Dawson*, the Fifth Circuit reasoned that the State "did not merely stipulate that Fuller was in the Aryan Brotherhood[;] [i]t introduced evidence that Fuller was a member of a gang that had committed unlawful or violent acts, including homicides, multiple stabbings, drug dealing, and aggravated assaults." *Id.* at 498. Although "Fuller was within his rights in joining the gang," the court held that the State "did not violate Fuller's First Amendment rights because it introduced relevant evidence of his future dangerousness." *Id.*[16]

---

[16] Similarly, in *United States v. Bone*, 433 F. App'x 831 (11th Cir. 2011) (per curiam) (unpublished), the court held that there was no plain error in the district court's consideration of the defendant's declaration of sovereignty at his sentencing for bank robbery and brandishing a firearm during a crime of violence. *Id.* at 835. In the view of the district court, "the statements were evidence of Bone's refusal to accept responsibility for his acts, his unpreparedness to return to society, the danger to himself and

(continued … )

Other courts of appeals also have upheld a sentencing judge's consideration of the defendant's protected associations, beliefs, or statements because that evidence was relevant to the sentencing factors set forth in 18 U.S.C. § 3553(a).[17] In addition, our sister circuits have held that such evidence is relevant to the defendant's likelihood of recidivism.[18] Still other courts have recognized that the Govern-

---

( … continued)

to others of returning him to society, and his lack of respect for the law." *Id.* Agreeing that these were "proper sentencing considerations under 18 U.S.C. § 3553(a)," the Eleventh Circuit concluded that the sentencing court "did not consider Bone's speech for the irrelevant and impermissible purpose of demonstrating his general moral reprehensibility." *Id.* (citing *Dawson v. Delaware*, 503 U.S. 159, 165 (1992)).

[17] As outlined in 18 U.S.C. § 3553(a), "[f]actors to be considered in imposing a sentence" include "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need for the sentence imposed" to, *inter alia*, "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." *Id.* § 3553(a)(1), (2). Representative cases include, *e.g.*, *United States v. DeChristopher*, 695 F.3d 1082, 1099 (10th Cir. 2012) (concluding that the defendant's statements that "he would 'continue to fight'" and "his view that it was 'fine to break the law' were 'highly relevant'" to determining "the sentence necessary to deter [him] from future violations and to promote respect for the law"), and *United States v. Stewart*, 686 F.3d 156, 170 (2d Cir. 2012) (concluding that the sentencing court "was properly concerned about whether [the defendant] considered her previous sentence to have been 'trivial,' and whether she had remorse for her acts adjudged to be serious crimes, not about any political views of hers").

[18] *See, e.g.*, *United States v. Simkanin*, 420 F.3d 397, 417 (5th Cir. 2005) (holding that defendant's "specific beliefs that the tax laws are invalid and do not require him to withhold taxes or file returns (and his associa-

(continued … )

ment may introduce evidence of a defendant's associations, beliefs, or statements to rebut mitigating evidence offered by the defense.[19]

Far less frequently, our sister circuits have held that a trial court violated a defendant's First Amendment rights by considering evidence of his protected activity that was not relevant in any way to his sentence. Mr. Schmidt principally relies on the First Circuit's decision in *United States v. Alvarez-Núñez*, 828 F.3d 52 (1st Cir. 2016), which vacated a sentence that "rested entirely on naked inferences drawn from the content of [] lyrics and music videos" performed by the defendant's musical group. *Id.* at 57. At sentencing, the district court "acknowledged that 'you cannot sentence somebody because he's a musician,' but nevertheless concluded that 'the lyrics of this music confirm … this individual's involvement with firearms, with violence, with

---

( … continued)

tion with an organization that endorses the view that free persons are not required to pay income taxes on their wages) [were] directly related to" his tax crimes and "demonstrate[d] a likelihood of recidivism").

[19] *See, e.g.*, *United States v. Fell*, 531 F.3d 197, 229–30 (2d Cir. 2008) (concluding that evidence of defendant's interest in multiple religions and of his "manufactured grievances based on his purported religious beliefs" "was reasonably elicited to present a more complete picture of Fell that belied the one of a well-adjusted inmate offered by the defense"); *United States v. Kane*, 452 F.3d 140, 142–43 (2d Cir. 2006) (per curiam) (upholding consideration of Kane's published writings, "to the extent that they rebutted his mitigating evidence," "on topics ranging from wife 'training' to illegal real estate transactions" because the "First Amendment does not bar the government from putting the lie to a defendant's proof at sentencing").

murders, in the context of a community like'" the defendant's public housing project. *Id.* at 56. The district court added that the group's song lyrics and music videos indicated "the need for deterrence because they comprised 'written and visual confirmation' of the defendant's 'inclination as to violence.'" *Id.* According to the sentencing judge, "these materials provided objective evidence … that this crime was not a mistake that the defendant committed one day," but that "this is an individual who makes a life not only carrying this kind of firearm, but also preaching the benefits of having this kind of firearm." *Id.* (alterations omitted) (internal quotation marks omitted). The First Circuit reversed. The court held that, absent "[e]vidence extrinsic to the protected words or conduct" indicating that the "work speaks to a defendant's motive, state of mind, or some other attribute in a way that is relevant to sentencing," "the mere fact that a defendant's crime happens to resemble some feature of his prior artistic expression cannot, by itself, establish the relevance of that expression to sentencing." *Id.* at 57. "[M]uch artistic expression, by its very nature," reasoned the court, "has an ambiguous relationship to the performer's personal views." *Id.* In Alvarez-Núñez's case, "[n]othing in the record indicate[d] that the lyrics or music videos had any direct application either to the defendant or to his lifestyle," nor were they "unlawful in any respect." *Id.* Therefore, "[g]iven the sentencing court's heavy reliance on protected conduct *that was not tied through extrinsic evidence to any relevant sentencing factor*, its sentencing rationale [was] implausible," and resentencing was required. *Id.* at 58. (emphasis added).

The Supreme Court's guideposts and the more specific elaboration of those guideposts by the courts of appeals

make clear that, although a person may not be punished solely for holding ideas that are reprehensible, those ideas, when combined with a person's history and character traits, can be relevant to a sentencing court's determination. As the cases set forth above demonstrate, the defendant's history and character are often most prominently displayed by the nature of the underlying offense or the circumstances that surround its commission. On other occasions, the history and character of the defendant are manifest most graphically in the criminal history and other life events detailed in the presentence report or other documentation in the record. With these principles in mind, we now turn to the district court's imposition of Mr. Schmidt's sentence.

**B.**

The propriety of Mr. Schmidt's sentence turns on whether his white supremacist beliefs were "relevant to the crime or to legitimate sentencing considerations." *Kapadia*, 229 F.3d at 648. We first examine whether these beliefs are relevant to the crime. This is not a case like *Kapadia* where the defendant "commit[ted] a crime motivated by bias against the very group of people he maligned with his hateful invective." *Id.* The court sentenced Mr. Schmidt for being a felon in possession of a firearm, a crime that can implicate a variety of underlying offense conduct. Moreover, none of the felonies subjecting him to this restriction,[20] nor his purpose in carry-

---

[20] Mr. Schmidt's felony convictions were for bail jumping, child abuse, and taking and driving a vehicle without the owner's consent. There is no indication in the presentence report that Mr. Schmidt's white su-

(continued … )

ing a handgun into the forest on this specific occasion,[21] involved or was otherwise motivated by his white supremacist beliefs. Indeed, the sentencing judge acknowledged as much, stating that he did not "put a great deal of weight" in Mr. Schmidt's ideas "because this offense … does not involve the use of the gun for this purpose."[22]

Because Mr. Schmidt did not commit a "bias-motivated crime," *Kapadia*, 229 F.3d at 647, we must examine next whether the district court's discussion of his white supremacist ideas was based on another legitimate sentencing consideration. *Id.* at 648. Section 3553(a) of Title 18 sets forth the factors relevant to the imposition of sentence. These include "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need for the sentence imposed" to "reflect the seriousness of the offense," "promote respect for the law," "afford adequate deterrence," and "protect the public from further crimes of the defendant." *Id.* § 3553(a)(1), (2).

In examining these factors, the district court was well aware that Mr. Schmidt had a firmly established pattern of violence, anger, threatening behavior, and an inability to control his impulses. On the basis of these observations, the district court expressed particular concern about

---

( … continued)

premacist beliefs featured in any of the underlying conduct for these offenses.

[21] According to the presentence report, Mr. Schmidt stated that his girlfriend had the gun to protect them from wolves.

[22] R.38 at 31.

Mr. Schmidt's threat of future dangerousness. It commented that "the ideas that are reflected in the Presentence Report and particularly in the introduction are dangerous and they make a person who holds them and *with a history like this* dangerous."[23] Noting Mr. Schmidt's 17 criminal convictions in the past 15 years and observing that, at age 32, Mr. Schmidt is no longer a "youthful offender," the court continued:

> Now as I said, I'm sentencing him for an of-
> fense, not for his ideas but I am—it seems to
> me I appropriately can consider those in decid-
> ing an important factor which is whether he
> represents a threat … to the community and
> whether he is a future danger.[24]

The court's comments make clear that that the district court did not sentence Mr. Schmidt based on his "mere ab-stract beliefs." *Dawson*, 503 U.S. at 167. Rather, as in *Kapadia*, the court properly considered Mr. Schmidt's white suprema-cist ideas and hatred for the United States as evidence that he "present[s] a threat of future dangerousness to the com-munity." 229 F.3d at 647; *see also id.* at 648 (noting that "[t]he First Amendment does not bar consideration of these state-ments at sentencing when they are indicative of … future dangerousness"). Mr. Schmidt's radical belief in the superi-ority of one race over all others, and his communication of that belief to the probation officer, against the advice of counsel, during his presentence interview, revealed the dan-

---

[23] *Id.* at 30 (emphasis added).

[24] *Id.* at 32.

ger of returning him to society. The district court therefore considered Mr. Schmidt's beliefs not for the impermissible purpose of demonstrating general moral reprehensibility, but for the legitimate sentencing purpose of determining his likelihood of future dangerousness.[25]

In addition to its consideration of Mr. Schmidt's future dangerousness, the district court expressed concern with the need, in light of Mr. Schmidt's earlier actions, to "promote respect for the law." 18 U.S.C. § 3553(a)(2). The court noted the probation office's sentencing recommendation, which indicated that Mr. Schmidt "repeatedly professed his hatred" for the United States "due to its allowance of … minorities to have civil rights" and "proclaimed a strong desire to relocate to Germany to retrace his Nazi ancestral heritage."[26] The court noted its "great alarm that a person holding these ideas has so little respect for the law."[27]

---

[25] In this context, the assessment of a defendant's future dangerousness, it certainly was relevant for the district court to consider the underlying offense of felon in possession. "Congress enacted [18 U.S.C.] § 922(g)(1) in order to keep firearms out of the hands of those persons whose prior conduct indicated a heightened proclivity for using firearms to threaten community peace and the 'continued and effective operation of the Government of the United States.'" *United States v. Jester*, 139 F.3d 1168, 1171 (7th Cir. 1998) (quoting *Lewis v. United States*, 445 U.S. 55, 66 (1980)). Indeed, the district court made this concern explicit during the sentencing hearing: "Congress is trying to send a very clear message that people that have engaged in … the type of conduct that lands a person in prison … are not to possess firearms because of the very dangerous nature of those particular types of devices and weapons." R.38 at 26.

[26] R.21 at 2.

[27] R.38 at 31.

Indeed, quite aside from his future dangerousness to others, the expression of these desires, combined with a record of repeated violations of law, evinced a willingness to continue on a path of lawlessness in the absence of significant correction.[28]

In the end, Mr. Schmidt's statements, when viewed in light of his criminal history and his continued disrespect for the law, raised a serious question in the sentencing judge's mind as to whether he posed a threat of violent or anti-social conduct to the community. There was no error, plain or otherwise,[29] in the district court's assessment that Mr. Schmidt's beliefs were reasonably related to a legitimate sentencing purpose.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

---

[28] We further note that the district court repeatedly disclaimed that it was imposing its sentence based on Mr. Schmidt's white supremacist beliefs. At least one court of appeals has upheld a sentence challenged on First Amendment grounds where the sentencing court "specifically admonished the defendants that it was not imposing its sentence on the basis of their political views or remarks." *United States v. Rosenberg*, 806 F.2d 1169, 1179 (3d Cir. 1986).

[29] Because there was no error under the usual standard or under the plain error standard, we need not determine whether defense counsel adequately preserved this issue at trial.