In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 20-3419

WYSINGO TURNER,

*Petitioner-Appellant,*

*v.*

CHRISTINE BRANNON-DORTCH, Warden,

*Respondent-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 19-cv-0693 — **Mary M. Rowland**, *Judge.*

_____

ARGUED MARCH 31, 2021 — DECIDED JANUARY 3, 2022

_____

Before SYKES, *Chief Judge*, and FLAUM and EASTERBROOK, *Circuit Judges*.

SYKES, *Chief Judge*. Wysingo Turner is serving a lengthy prison term for fatally shooting Krystal Rodney during a heated argument outside her home in Chicago. At his trial in state court, Turner claimed that the shooting was accidental. He testified that Krystal grabbed the handgun he was carrying and that it discharged in the ensuing scuffle. Seeking to cast doubt on Turner's story, the prosecutor

cross-examined him about why he was carrying a loaded gun that day. Turner admitted that he frequently kept a loaded firearm in his car for protection. The prosecutor pressed him further, asking whether he knew it was illegal to have a loaded gun in his car in Chicago and whether he thought he was "entitled to just break the law." He replied that keeping a loaded gun in his car wasn't illegal—or if it was, he was unaware of that law.

The jury rejected Turner's "accidental discharge" defense and found him guilty of first-degree murder. Turner appealed, arguing that the prosecutor's cross-examination about the legality of his gun possession violated his Second Amendment right to bear arms. The appellate court disagreed and affirmed the judgment. After exhausting state postconviction remedies, Turner sought federal habeas relief under 28 U.S.C. § 2254, reprising his Second Amendment argument. It fared no better in federal court. The district judge denied the petition but granted a certificate of appealability.

We affirm. The state court addressed Turner's claim on the merits, so federal habeas relief is unavailable unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established [f]ederal law." 28 U.S.C. § 2254(d)(1). We see no error in the state court's ruling, let alone one that meets § 2254(d)'s demanding standard.

## I. Background

The events culminating in Krystal Rodney's death began on August 10, 2010, two days before the fatal shooting. At the time, Krystal lived with her 12-year-old son Demar'J

Bankston in the basement of a home on South Justine Street in Chicago. Silvia Gandy, Krystal's half-sister and a friend of Turner's, lived upstairs with her three-year-old son Ya'Shon and her grandmother Queen Spencer. Walter Gandy, Queen's son, also lived there.

On August 10 Silvia called Turner and asked him to take Ya'Shon to get the vaccinations he needed for school. Turner agreed and drove to the Justine Street home. Silvia, Ya'Shon, and Krystal got into his car. An intense argument broke out during the drive, and Turner pulled over at a local police station to enlist help in removing them from the car.

On the morning of August 12 Turner again visited the Justine Street residence. He and Krystal talked outside the home and tempers again flared. Turner left but returned a few hours later. What happened next was hotly disputed at trial.

Twelve-year-old Demar'J was the only eyewitness to the shooting. He testified that Turner returned that afternoon, got out of his car, and approached the house carrying a beer bottle and asked to see Sylvia. Demar'J replied that she wasn't home. Turner then asked to see Krystal, who came outside. She and Turner argued again, and Demar'J saw Turner pull a silver handgun from the back of his pants and shoot Krystal in the neck. Turner returned to his car and fled the scene.

Queen Spencer was home that afternoon but did not see the shooting. She testified that Turner was a frequent visitor to the home and was there on the afternoon of August 12. From inside the house, she heard him talking with Krystal outside and then heard a gunshot. She immediately went to

the front porch and saw Turner walking to his car with a gun in his hand. She testified that he got into his car, lowered his head to the steering wheel and said, "Oh my god," and then drove away. Walter Gandy testified that he was at home on the morning of August 12 and heard Krystal arguing with Turner, but he was not there at the time of the shooting.

Turner recounted a starkly different version of these events. He told the jury that he kept a loaded handgun in his car for protection, and when he returned to the Gandy home on the afternoon of August 12, he put the gun in his left pocket because "thugs" often loitered in the area. He testified that as he walked down the gangway toward the home, Krystal approached him, snatched the gun from his pocket, and aimed it at him. Turner said that he feared for his life and tussled with Krystal for control of the firearm, which accidentally discharged during the struggle. He denied pulling the trigger.

The prosecutor confronted Turner about his gun possession on cross-examination.

> Q:    What kind of gun is that that you carry
>       in your car?
> A:    It's a Magnum 45.
> Q:    Was it loaded?
> A:    Yes, it was.
>
>       . . . .
>
> Q:    And when did you load that gun?
> A:    Maybe about 8 years ago.
> Q:    8 years ago. You haven't fired it for
>       8 years?
> A:    Never had no need to.
>
>       . . . .

Q:     And you say you carried it in your car
       for protection?

A:     Yes, I do.

Q:     And it's against the law to carry your
       gun in the car, isn't it?

[Objection overruled.]

A:     No, it's not.

Q:     And it's against the law to carry a load-
       ed gun on the streets of the City of
       Chicago when you're driving your car,
       correct?

A:     No.

Q:     And you think that you are entitled to
       just break that law, correct?

A:     I never known it was a law.

The lawfulness of Turner's gun possession arose again in closing argument. After noting that Turner's "accidental discharge" theory turned on his credibility, the prosecutor commented on his testimony about keeping a loaded gun in his car:

> Let's just talk about a couple of things. "I drove with a loaded gun in my car. I always drive with a loaded gun in my car." Apparently he doesn't care about the law[] because he can pick and choose the law that he does or does not want to follow[] because he's Wysingo Turner. … [T]hat's the type of guy he is.

The jury rejected Turner's defense and found him guilty of first-degree murder, and the judge imposed a sentence of

60 years in prison. The Illinois Appellate Court affirmed the judgment. *People v. Turner*, 2015 IL App. (1st) 133649-U (Ill. App. Ct. 2015) (unpublished). Among other arguments on direct appeal, Turner claimed that the prosecutor violated his Second Amendment right to bear arms by questioning him about the legality of keeping a loaded gun in his car and commenting on this testimony during closing argument. *Id*. at ¶ 48.

Turner's argument relied heavily on *Dawson v. Delaware*, 503 U.S. 159 (1992). There the Supreme Court held that introducing irrelevant evidence of the defendant's membership in a white-supremacist group during the penalty phase of his capital trial served no legitimate purpose and thus violated the defendant's associational rights under the First Amendment. *Id*. at 167–68.

Turner's analogy to *Dawson* did not succeed. The state appellate court rejected his Second Amendment argument, reasoning that Turner's case was different because he himself had introduced the evidence that he carried a loaded gun in his car, so the prosecutor's questions and comments were relevant and did not infringe his Second Amendment right to bear arms. *Turner*, 2015 IL App. (1st) at ¶ 52. The Illinois Supreme Court declined review.

After unsuccessful state postconviction proceedings, Turner sought federal habeas relief under § 2254, raising the same Second Amendment claim. Applying the deferential review required by § 2254(d), the district judge concluded that the state court reasonably determined that Turner's case was distinguishable from *Dawson*. The judge therefore denied relief but granted a certificate of appealability.

## II. Discussion

Turner faces a high hurdle. Because the state court addressed his claim on the merits, a federal court may not grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." § 2254(d)(1). "This standard is difficult to meet." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per curiam) (quotation marks omitted).

Turner concedes that the state appellate court applied the correct federal law, so his argument is really quite limited: he contends that the state court unreasonably applied *Dawson* in rejecting his claim that the prosecutor's questions and comments about the legality of his gun possession violated his Second Amendment right to bear arms as announced in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). To prevail on this claim, Turner must establish that "the state court's ruling … was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). He falls far short of satisfying his burden.

We begin with the observation that Turner's claim doesn't rest directly on *Heller* and *McDonald*. The Court's Second Amendment decisions are simply in the background. The claim turns entirely on *Dawson*. As we've noted, there the Court held that it was constitutional error to admit irrelevant evidence of a capital-murder defendant's membership in a white-supremacist group during the penalty phase of his trial. *Dawson*, 503 U.S. at 167–68. To

understanding this holding—or more importantly, the *limits* of this holding—some additional unpacking is necessary.

David Dawson and three other inmates escaped from a Delaware prison and went on a crime spree that included burglary, theft, and murder. *Id.* at 161. A jury convicted Dawson of murder during the guilt phase of his trial. Before the penalty phase began, in which the jury would consider whether to recommend a death sentence, the prosecution announced its intention to introduce evidence of Dawson's membership in the Aryan Brotherhood, a white supremacist group with affiliated gangs in many prisons. Among other evidence, the prosecution sought to introduce photographs of Dawson's racist tattoos—swastikas and Aryan Brotherhood symbols and names—as well as expert testimony about the origins and nature of the Aryan Brotherhood. *Id.* at 161–62.

When the defense objected, the prosecution agreed to drop its expert witness and instead read a stipulation to the jury explaining that the Aryan Brotherhood is a white supremacist gang that exists in many prisons. *Id.* at 162. The defense maintained its objection to the other Aryan Brotherhood evidence, but the trial judge permitted the prosecution to introduce photos of some of the tattoos in addition to the stipulation. *Id.* The jury recommended a sentence of death. The court was bound by that recommendation and imposed a death sentence. *Id.* at 163.

Dawson challenged the admission of the Aryan Brotherhood evidence on appeal to the Delaware Supreme Court, but the court affirmed his conviction and sentence. The Supreme Court granted certiorari and reversed, ruling that admitting this evidence was constitutional error. *Id.* The

Court did not, however, accept Dawson's broadest argument: he maintained that admitting evidence of constitutionally protected associations, activities, or beliefs is *always* unconstitutional. *Id*. at 164–65. The Court rejected this broad claim, explaining that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Id*. at 165.

Rather, the holding in *Dawson* is more limited: the Aryan Brotherhood evidence served no legitimate purpose because it was irrelevant to any issue in the penalty phase of trial. The Court observed that "the narrowness of the stipulation left the Aryan Brotherhood evidence totally without relevance to Dawson's sentencing proceeding" and "proved nothing more than Dawson's abstract beliefs." *Id.* at 165, 167. Indeed, the Court surmised that the evidence was "employed simply because the jury would find these beliefs"— and Dawson's association with others who held similar racist beliefs—to be "morally reprehensible." *Id.* at 167. The Court thus concluded that the First Amendment barred the state from introducing evidence of Dawson's associations and abstract beliefs during his sentencing proceeding when those associations and beliefs had "no bearing on the issue being tried." *Id*. at 168.

The irrelevance of the Aryan Brotherhood evidence is a key limit on *Dawson*'s reach. The decision does not extend to the admission of relevant evidence, even if the evidence concerns constitutionally protected conduct. *Wisconsin v. Mitchell*, 508 U.S. 476, 486 (1993); *United States v. Schmidt*, 930 F.3d 858, 865 (7th Cir. 2019). So if the evidence of Turner's

firearm possession was relevant, then his *Dawson* claim necessarily fails. And that's true even if we assume for the sake of argument that his firearm possession was constitutionally protected.

The state appellate court rejected Turner's claim on precisely this ground: "[E]vidence that [Turner] carried a gun, which was introduced by the defendant himself, was relevant as to why [he] had a loaded gun with him on the day in question." *Turner*, 2015 IL App. (1st) at ¶ 52. We see no error in this ruling, let alone an error "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Turner counters that even though his firearm possession was relevant, its legality was not. That may be so; the prosecutor's emphasis on Turner's character strikes us as an invitation to draw an improper character-propensity inference. *E.g.*, *People v. Ward*, 952 N.E.2d 601, 606 (Ill. 2011). But that's an error of state evidence law, not a federal constitutional violation. The problematic irrelevant evidence in *Dawson* concerned the defendant's constitutionally protected *conduct*—his association with a racist organization—not the legality of that conduct. Here, the prosecutor's apparent attempt to draw an impermissible character-propensity link is simply irrelevant to Turner's bid for federal habeas relief. *See* § 2254(a) (limiting federal habeas relief to violations of federal law).

Accordingly, we agree with the district judge that the state court reasonably applied *Dawson*. The § 2254 petition was properly denied.

AFFIRMED.